IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| LILIAN ALESSA, | * |
| Plaintiff, | * |
| v. | *   Case No.: 8:21-cv-00924-DLB |
| CARLOS DEL TORO, Secretary of the Navy, *et al.*, | * |
| | * |
| Defendants. | |
| | * |
| | *** |

**UNITED STATES OF AMERICA'S OPPOSITION TO
PLAINTIFF'S MOTION TO CHALLENGE WESTFALL ACT CERTIFICATION
FOR TODD BOONE AND EDWARD WESTFALL**

The United States of America, by and through undersigned counsel, hereby submits this Opposition to Plaintiff's Motion to Challenge Westfall Act Certification for Todd Boone and Edward Westfall ("Opposition"). In support of this Opposition, the United States of America states the following.

**I.    FACTUAL BACKGROUND**

Plaintiff is and at all relevant times was a President's Professor at the University of Idaho. (Am. Compl. ¶ 2, ECF No. 114.) From July 1, 2018, through May 15, 2019, Plaintiff was assigned to work at the National Maritime Intelligence-Integration Office ("NMIO") under an Assignment Agreement pursuant to the Intergovernmental Personnel Act of 1970, 5 U.S.C. §§ 3371-3376, between the University of Idaho and NMIO. (*See* Assignment Agreement, ECF No. 1-2; Letter, ECF No. 84-9.) Todd Boone, then-Department Head of NMIO's Intelligence Integration Department, was Plaintiff's first-line supervisor, and CAPT Edward Westfall, then-Deputy Director of NMIO, was Plaintiff's second-line supervisor. (Boone Decl. at 1, 2, ECF No. 84-4.)

## II.   PROCEDURAL HISTORY

On May 18, 2020, Plaintiff filed this case in the United States District Court for the District of Columbia. (*See* Compl., ECF No. 1). She sued the Secretary of the Navy for gender discrimination (Count One), religious discrimination (Count Two), gender and religious discrimination (Count Three), retaliation (Count Four), and hostile work environment (Count Five), and federal employee Todd Boone and former federal employee CAPT Edward Westfall for defamation and defamation *per se* (Counts Six and Seven). *Id.* On July 6, 2020, Daniel F. Van Horn, the Chief of the Civil Division of the United States Attorney's Office for the District of Columbia, certified that the Mr. Boone and CAPT Westfall were acting within the scope of their employment with the United States of America at the time of the allegedly tortious conduct. (Certification, ECF No. 33-2.) On July 21, 2020, the United States moved to dismiss Plaintiff's defamation and defamation *per se* claims against Mr. Boone and CAPT Westfall and transfer the employment discrimination claims to the District of Maryland. (Mot., ECF No. 6.) On March 31, 2021, the United States District Court for the District of Columbia found that the District of Columbia was not an appropriate venue for Plaintiff's employment discrimination claims and transferred the entire case to the District of Maryland. (Order, ECF No. 11.) In doing so, that Court did not rule on the United States's motion to dismiss, stating, "[t]he transferee court will resolve the issues with respect to the state law claims." (*Id.* at 1.)

On September 13, 2021, the United States moved to dismiss the defamation and defamation *per se* claims in this Court. After briefing and a hearing on the government's motion to dismiss, (ECF Nos. 34, 39, 42, 43, 45, & 47), the Court denied the government's motion to dismiss without prejudice and ordered limited discovery on the issue of whether Mr. Boone and CAPT Westfall were acting within the scope of their employment when they made the allegedly

defamatory statements. (Order, ECF No. 49.)

Scope-of-employment discovery included: (1) Interrogatories to Mr. Boone; (2) Interrogatories to CAPT Westfall; (3) Document Requests to Mr. Boone; (4) Document Requests to CAPT Westfall; (5) Document Requests to the Navy; (6) Interrogatories to Plaintiff; (7) Document Requests to Plaintiff; (7) Mr. Boone's deposition; (8) CAPT Westfall's deposition; and (9) Plaintiff's deposition.

In the meantime, on September 8, 2023, the United States filed a Motion to Substitute United States of America as Defendant for Todd Boone and Edward Westfall. (ECF No. 94.) On February 21, 2024, the Court granted that Motion without prejudice as to Plaintiff's ability to challenge the scope-of-employment Certification. (Order at 1, ECF No. 110.)

Scope-of-employment discovery ended March 1, 2024. (Order at 3, ECF No. 101.) It was extended, however, for the limited purpose of completing depositions and resolving the discovery disputes that were discussed at the February 21, 2024, hearing. (Letter Order, ECF No. 110.) Depositions were complete by April 3, 2024. (*See* Letter, ECF No. 129.) The discovery disputes that were discussed at the February 21, 2024, hearing, as well as a few others, were resolved by mid-May. (*See id.*) On July 4, 2024, Plaintiff filed the subject Motion to Challenge Westfall Act Certification (the "Motion"). (ECF No. 135.) When the Court denies the Motion, the United States intends to refile a motion to dismiss Plaintiff's defamation claims for lack of subject-matter jurisdiction.

### III.   LEGAL STANDARDS

#### A.   Certification

When a federal employee is sued, the United States Attorney or his delegee, acting on behalf of the Attorney General, must decide whether to certify that the employee was acting within

3

the scope of his employment at the time of the alleged tortious act. 28 U.S.C. § 2679(d)(1). If such a certification is made, the United States is substituted as defendant, and the plaintiff's only route to recovery is through the FTCA. *Id.*; *see also Chin v. Wilhelm*, 291 F. Supp. 2d 400, 403 (D. Md. 2003).

A plaintiff may challenge such certification. *Gutierrez de Martinez v. Drug Enforcement Administration*, 111 F.3d 1148, 1155 (4th Cir. 1997). In challenging a scope-of-employment certification, the burden is on the plaintiff to demonstrate that the federal employee was not acting within the scope of his employment. The Fourth Circuit in *Gutierrez de Martinez v. Drug Enforcement Administration* explains:

> In short, the scope-of-employment certificate is *prima facie* evidence that the defendant federal employee acted within the scope of his employment, thereby placing the burden on the plaintiff to prove otherwise. If the plaintiff does not come forward with any evidence, the certification is conclusive. Moreover, the plaintiff's submission must be specific evidence or the forecast of specific evidence that contradicts the Attorney General's certification decision, not mere conclusory allegations and speculation. If the plaintiff's evidence is sufficient to carry the burden of proof, the defendant federal employee or the Government may come forward with evidence in support of the certification. At this point, the district court must determine whether there are any genuine issues of fact material to the scope-of-employment decision, and, if so, it may conduct an evidentiary hearing to resolve these factual issues. Once any factual issues are resolved, the district court should weigh the evidence on each side to determine whether the certification should stand. During this process, the district court should remain cognizant of the considerations weighing against protracted litigation under the Westfall Act.

*Id.*; *see also Maron v. United States*, 126 F.3d 317, 323 (4th Cir. 1997) ("We join with our sister circuits in placing the burden on the plaintiff to refute the certification of scope of employment issued by the Attorney General and to prove by a preponderance of the evidence that the defendants were not acting within the scope of their employment.").

To meet this burden, a plaintiff "must, at a minimum, present or forecast evidence that shows that the conduct of the officers or employees at issue did not involve the type of work they were employed to perform, occurred outside authorized space and time or was purely personal in nature." *Doe v. Meron*, 929 F.3d 153, 165 (4th Cir. 2019) (cleaned up). To do this, a plaintiff may rely on the pleadings, affidavits, or other supporting documentary evidence. *Id.* (citing *Gutierrez de Martinez*, 111 F.3d at 1155). She cannot rely on conclusory allegations and speculation. *Id.*

B. **Scope of Employment**

Whether a federal employee's action falls within the scope of his employment must "be determined according to the rules of respondeat superior of the state in which the wrongful conduct occurred." *Jamison v. Wiley*, 14 F.3d 222, 237 (4th Cir. 1994)). Since the alleged defamatory statements were made in Maryland, Maryland's respondeat superior law governs the scope-of-employment determination.

An "employer may be held vicariously liable for defamatory falsehoods made by its employees." *Thomas v. Bet Sound-Stage Restaurant/BrettCo, Inc.*, 61 F. Supp. 2d 448, (D. Md. 1999) (citing *Embrey v. Holly*, 442 A.2d 966, 972 (Md. 1982)) (denying motion to dismiss the plaintiff's defamation claim against employer based on the alleged defamatory statements of employer's employee). Maryland's general vicarious liability test is outlined in *Sawyer v. Humphries*, 587 A.2d 467 (Md. 1991). Under *Sawyer*, an employee's acts are within the scope of his employment if they were performed by the employee in furtherance of the employer's business and were "such as may be fairly said to have been authorized by" the employer. *Sawyer*, 587 A.2d at 470 (quoting *Hopkins C. Co. v. Read Drug & C. Co.*, 92 A. 478, 479-80 (Md. 1914)). "Authorized" is "not meant authority expressly conferred, but whether the act was such as was incident to the performance of the duties entrusted to [the employee] by the master, even though

in opposition to his express and positive orders." *Id.* (quoting *Hopkins C. Co.*, 92 A. at 479-80)).

In applying this test, various considerations may be pertinent. For example, for an employee's actions to be within the scope of his employment, they "must be of the kind the servant is employed to perform and must occur during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area, and actuated at least in part by a purpose to serve the master." *Id.* at 471 (quoting *E. Coast Lines v. M. & C.C. of Balto.*, 58 A.2d 290, 304 (1948)).

> On the other hand, certain conduct of the servant may be within the scope of his employment, although not intended or consciously authorized by the master, but "(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:—(a) whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal."

*Id.* (quoting *A. & P. Co. v. Noppenberger*, 189 A. 434, 440 (1937) (quoting Restatement of Agency § 229 (1933))). An additional factor is "whether the employee's conduct was 'expectable' or 'foreseeable.'" *Id.* (cleaned up).

Moreover, "and particularly in cases involving intentional torts committed by an employee" the Maryland Supreme Court "has emphasized that where an employee's actions are

6

personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality, the employee's actions are outside the scope of his employment." *Id.* (cleaned up). Finally, "where the conduct of the servant is unprovoked, highly unusual, and quite outrageous," courts tend to hold "that this in itself is sufficient to indicate that the motive was a purely personal one" and the conduct outside the scope of employment. *Id.* (cleaned up).

### IV.   ARGUMENT

Plaintiff cannot meet her burden of demonstrating by a preponderance of the evidence that Mr. Boone and CAPT Westfall were acting outside the scope of their employment with the Navy when they allegedly made defamatory statements about her. As indicated above, Plaintiff cannot meet her burden by relying on conclusory allegations or speculation. *Meron*, 929 F.3d at 165. And now, notwithstanding approximately two years of discovery on the sole issue of whether Mr. Boone and CAPT Westfall were acting within the scope of their employment, Plaintiff still has failed to uncover any evidence.

What is more, Plaintiff's Motion is entirely devoid of any legal argument whatsoever. Instead, it simply cursorily and incompletely describes Maryland vicarious liability law, briefly describes Plaintiff allegations, cites to exhibits, and then asks the court to conclude that Mr. Boone and CAPT Westfall were not acting within the scope of their employment. More specifically, Plaintiff marches quickly through five categories of alleged defamation. The United States will address each in turn. The balance of Plaintiff's defamation allegations is not addressed in Plaintiff's Motion, and the United States's position is that Plaintiff thereby abandoned those claims as well as any assertions that Mr. Boone and CAPT Westfall were not acting within the scope of

their employment for purposes of those unaddressed allegations.

### A. There is no evidence that Mr. Boone or CAPT Westfall stated that Plaintiff had an extramarital affair with Mr. Moon, and any communications concerning Plaintiff's and Mr. Moon's inappropriate touching at meetings was in furtherance of NMIO's business.

Plaintiff alleges that Mr. Boone and CAPT Westfall "stated" that she and Department of Homeland Security ("DHS") employee Sean Moon were engaged in an extramarital affair. Curiously, Plaintiff does not even identify to whom and when those statements were allegedly made. (*See* Mot. at 7, ECF No. 135.) Her entire argument is that such statements "are unequivocally false" and "would not serve the Navy's interest or be authorized by the Navy." (*Id.*)

As an initial matter, Mr. Boone and CAPT Westfall each testified that they did not state to anyone that Plaintiff was having an extramarital affair with Mr. Moon. Mr. Boone answered Plaintiff's Interrogatory Number 1, in relevant part, that he "did not make or receive any communications concerning Dr. Alessa's mental health, sexual history, or sexual activity." (ECF No. 135-10.) Mr. Boone answered Plaintiff's Interrogatory Number 2, in relevant part, that neither he "nor any other person of whom Mr. Boone is aware has made or received communications that stated or implied that Dr. Alessa had engaged in an extramarital affair." (*Id.*) Mr. Boone testified at his deposition that he did not submit an anonymous complaint to DHS, Mr. Moon's employer, reporting that Plaintiff and Mr. Moon were engaged in an extramarital affair. (Boone Dep. 47:22-48:3, Mar. 1, 2024, ECF No. 136; *see also id.* 151:21-153:2.)

CAPT Westfall answered Plaintiff's Interrogatory Number 1, in relevant part, that he "did not make or receive any communications concerning Dr. Alessa's mental health, sexual history, sexual activity, or suitability for national security clearance status." (ECF No. 135-9.) CAPT Westfall answered Interrogatory Number 2, which asked if he was "aware, ever made or received communications that stated or implied that Dr. Lilian Alessa . . . had engaged in an extra-marital

affair": "None." (*Id.*) CAPT Westfall testified at his deposition that he never believed Plaintiff was engaging in an extramarital affair with Mr. Moon (Westfall Dep. 54:20-22, Mar. 29, 2024, ECF No. 135-8), he never alleged that Plaintiff was having an extramarital affair (*id.* 55:1-3; 180:16-18), and he never told anyone that Plaintiff was having an extramarital affair (*id.* 57:9-12; 58:3-7).

As best the United States can tell, Plaintiff's allegations that Mr. Boone and CAPT Westfall stated that Plaintiff had an extramarital affair with Mr. Moon stem from Plaintiff's misconstruction of circumstances surrounding complaints Mr. Boone, as Plaintiff's first-line supervisor, received and communicated to CAPT Westfall, Plaintiff's second-line supervisor, about Plaintiff's and Mr. Moon's inappropriate interactions at meetings. (Boone's Answer to Interrog. No. 1, ECF No. 135-10; Westfall's Answer to Interrog. No. 1, ECF No. 135-9.) In his answer to Plaintiff's Interrogatory Number 1, CAPT Westfall explained that he

> was notified by NMIO staff, the identities of whom he cannot recall, about an incident several people perceived to be inappropriate personal conduct between Dr. Alessa and Sean Moon; specifically, Dr. Alessa and Mr. Moon had been touching each other during meetings, and Mr. Moon had been making sexually inappropriate comments. This conduct was address in a counseling session on September 5, 2018.

(ECF No. 135-9.) There is no evidence that the circumstances of these complaints of inappropriate touching between Plaintiff and Mr. Moon or the action NMIO, Mr. Boone, or CAPT Westfall took were communicated to anyone who was not legally entitled to such information. Moreover, any communications that did occur would most certainly have been in furtherance of and authorized by the Navy in an effort to keep NMIO's work environment safe, appropriate, and comfortable for all NMIO employees and NMIO collaborators, including, but not limited to, Plaintiff and Mr. Moon.

In short, there are only vague and nonspecific allegations that Mr. Boone and CAPT

Westfall told unidentified individuals that Plaintiff and Mr. Moon were involved in an extramarital affair. After approximately two years of discovery, Plaintiff could not find any evidence of such communications. On the other hand, there is evidence that no such communications ever took place, in the form of Mr. Boone's and CAPT Westfall's answers to interrogatories and deposition testimony. Plaintiff has not only failed to meet her burden of proving that Mr. Boone and CAPT Westfall were acting within the scope of their employment with respect to this allegation, but she has also utterly failed to show that this allegation happened at all. The court, therefore, should deny the Motion with respect to this claim.

> **B.  There is no evidence – only speculation – that Mr. Boone made an anonymous complaint to DHS.**

Plaintiff alleges that Mr. Boone submitted an anonymous complaint to DHS, Mr. Moon's employer, alleging that Plaintiff and Mr. Moon engaged in an extramarital affair. (Mot. at 7-8, ECF No. 135.) However, Mr. Boone testified that he did not submit an anonymous complaint to DHS and was not even aware that one had been submitted. (Boone Dep. 47:22-48:17, ECF No. 136.)

Plaintiff speculates that the complaint was submitted by Mr. Boone because of the complaint's "focus on the alleged affair," mention that an employee was removed because of the alleged affair, "reliance on specific travel dates and data," and reference to the fact that Mr. Moon was Plaintiff's first-line supervisor. (Mot. at 8, ECF No. 135.) Under even only slight scrutiny, however, Plaintiff's speculation does not hold up.

First, as explained in detail above, Mr. Boone never communicated to anyone, including DHS, that Plaintiff engaged in an extramarital affair. (*See* Boone's Answer to Interrog. No. 1, ECF No. 135-10; Boone Dep. Boone Dep. 47:22-48:3; 151:21-153:2, ECF No. 136.) There also were several individuals who observed Plaintiff's and Mr. Moon's inappropriate touching at meetings

(Boone's Answer to Interrog. No. 1, ECF No. 135-10; Westfall's Answers to Interrog. No. 1, ECF No. 135-9) and, based on that behavior, those individuals may have assumed that Plaintiff and Mr. Moon were having an affair and reported as much to DHS.

Second, Plaintiff in fact was not removed because of the alleged affair, and Mr. Boone knows that. It, therefore, does not make sense that a statement that Plaintiff was removed because of the alleged affair somehow links the anonymous complaint to Mr. Boone. Plaintiff's employment at NMIO ended when NMIO terminated the Assignment Agreement with University of Idaho because the project to which she was assigned, BDAADS, was suspended and shortly thereafter discontinued. (*See* Price[1] Decl. at 12, ECF No. 84-6; *see also* Boone Decl. at 43, 48, ECF No. 135-5.) To be clear, Plaintiff in fact was not terminated because of an alleged affair, and Mr. Boone knew the reason the Assignment Agreement was discontinued.

Third, Mr. Boone was not the only person with access to the dates on which Plaintiff traveled from her home in Idaho to NMIO. By Plaintiff's own admission, at least three other people had access to Plaintiff's travel dates. (Plaintiff's Answer to Interrog. No. 1, ECF No. 135-5.)

Fourth, according to the Assignment Agreement between DHS and the University of Idaho, pursuant to which Plaintiff was assigned to work at DHS at the same time she was assigned to work at NMIO, Mr. Moon in fact was Plaintiff's DHS first-line supervisor. (DHS Assignment Agreement, ECF No. 84-7.) It, therefore, is unclear what probative value the fact that Mr. Moon was referred to as Plaintiff's supervisor in the anonymous complaint has on the issue of whether Mr. Boone submitted the anonymous complaint to DHS.

Additionally, there is evidence that the individual who made the anonymous complaint was

---

[1] RDML Gene Price was the Director of NMIO at the relevant time. (Price Decl. at 1-2, ECF No. 84-6.) He issued the stop-work order (Mar. 15, 2019, Email, ECF No. 84-8), and he canceled the Assignment Agreement between NMIO and the University of Idaho (May 9, 2019, Letter, ECF No. 84-9).

11

a DHS Policy employee – not Mr. Boone, who is a NMIO/Navy employee. As Plaintiff described in her Answers to Interrogatory Number 1, "[a]ccording to the assigned investigator, the DHS Complaint stated . . . that the complainant was a DHS Policy employee . . . ." (ECF No. 135-1.) Mr. Boone was and is a Navy/NMIO employee and was not and is not a DHS employee.

In conclusion, after nearly two years of discovery, there is no evidence – only a theory by Plaintiff – that Mr. Boone submitted the anonymous complaint to DHS. On the other hand, there is evidence that Mr. Boone did not submit the anonymous complaint to DHS: Mr. Boone's answers to Interrogatory Numbers 1 and 2 and Mr. Boone's deposition testimony. Plaintiff has not only failed to meet her burden of proving that Mr. Boone was acting within the scope of his employment with respect to this allegation, but she has also utterly failed to show that this allegation happened at all. The Court, therefore, should deny the Motion with respect to this claim.

> **C.** **Mr. Boone did not accuse Plaintiff of travel fraud and his statements concerning her April 17, 2019, travel request was made within the context of his required response to an EEO investigator's questions.**

Plaintiff alleges that Mr. Boone defamed Plaintiff when he accused her of "travel fraud, accepting a per diem for travel funded by the Navy without using it for Navy business" in the Declaration he executed in connection with the Navy's investigation of Plaintiff's employment discrimination complaint. (Mot. at 8-9, ECF No. 135.) She cites and attaches Mr. Boone's Declaration in its entirely without specific citations or quotation.

As best the United States can tell, these allegations arise in the context of Plaintiff's allegations that she was discriminated against when, on April 17, 2019, CAPT Westfall and CDR Wilson denied her request to travel to NMIO April 23-27, 2019. (*See* Boone Decl. at 34, ECF No. 135-5.) First, Mr. Boone points out that,

> on 15 March 2019, RDML Price put an all-actions-stop on the BDAADS project for everyone involved in BDAADS activity

> (internal and external to NMIO, to include my lead for the project, Dr. Alessa). <u>This means any BDAADS project activity after 15 March 2019 is project activity by BDAADS project officers and participants in violation of the Admiral's order</u>.

(*Id.* at 35 (emphasis in original).) In response to the question: "Did [Plaintiff] submit travel requests for April 23-27, 2019, as alleged in the complaint," Mr. Boone responds, "Yes." (*Id.*) However, he testified that he did not approve the request because of the stop-work order in place as of March 15, 2019, which eliminated the need for Plaintiff to travel to NMIO. (*Id.* at 37-38.) He then went on to explain why the stop-work order compelled him not to approve the stop-work order: there was no work for Plaintiff to perform on NMIO's behalf and thus no reason for Plaintiff to travel from her home in Idaho to NMIO in Maryland. (*Id.*) Lastly, he pointed out that, according to the Defense Travel Service log, there had been thirteen receipts for travel by Plaintiff during the period after the BDAADS project and Plaintiff's work for NMIO ended, from March 19, 2019, to November 20, 2019. (*Id.* at 38.) No where in his Declaration does Mr. Boone accuse Plaintiff of fraud. (*See generally id.*)

Even if Mr. Boone's responses to the investigator's questions concerning Plaintiff's discrimination allegations could be construed as accusing Plaintiff of travel fraud, such statements were made in the scope of Mr. Boone's employment. To be clear, Mr. Boone was presented with the EEO investigator's questions, to which he was asked to respond under oath, because he was Plaintiff's first-line supervisor, his actions toward Plaintiff were at issue in connection with Plaintiff's employment discrimination allegations, and he was a person who likely had knowledge of Plaintiff's employment discrimination allegations. He responded to the questions squarely within his role as a Navy employee. His responses further the Navy's endeavors to investigate Plaintiff's discrimination allegations and he unequivocally was not only authorized but was expected to respond to the investigator's questions. *See Meron*, 929 F.3d at 165.

Moreover, Mr. Boone's statements were not personal in nature and were not made in his personal capacity; they were made in his capacity as a Navy employee. *See id.*; *Sawyer*, 587 A.2d at 471 (cleaned up). Mr. Boone's statements were not made for the purpose of furthering his own interests; they were made in furtherance of the Navy's investigation into Plaintiff's employment discrimination allegations. *See Sawyer*, 587 A.2d at 471 (cleaned up). Furthermore, Mr. Boone's statements recounting Plaintiff's travel requests and his decision not to approve Plaintiff's April 17, 2019, travel request are not "highly unusual" or "quite outrageous" such that they are inherently outside the scope of Mr. Boone's employment. *Id.*

In sum, Mr. Boone did not accuse Plaintiff of travel fraud in his Declaration. Even if his statements concerning Plaintiff's April 17, 2019, travel request could be construed as accusatory, such statements were clearly made in response to a Navy investigator questions about Mr. Boone's role in Plaintiff's employment discrimination allegations and, accordingly, within the scope of his employment by the Navy. The Court, therefore, should deny the Motion with respect to this claim.

**D.    Mr. Boone's April 17, 2023, email is not at issue in this litigation.**

Plaintiff argues that Mr. Boone defamed Plaintiff again just last year when he allegedly accused her of travel fraud in an email. (Mot. at 9, ECF No. 135.) The email was sent nearly three years after the subject litigation was even filed. That email, therefore, cannot possibly form the basis for Plaintiff's claims in this litigation and is otherwise irrelevant to the question of whether Mr. Boone was acting within the scope of employment for purposes of any of the claims actually at issue in this litigation.

**E.    Even assuming Mr. Boone and CAPT Westfall made derogatory remarks about Plaintiff's professional abilities and qualifications (which they deny), such remarks would have been made within the scope of their NMIO employment.**

Lastly, Plaintiff alleges that, after she left NMIO, Mr. Boone and CAPT Westfall falsely

14

told others that she had been fired from NMIO for cause, had her security clearance revoked, exaggerated her credentials, and was an "insider threat." (Mot. at 9-10, ECF No. 135.) Plaintiff supports these allegations with a declaration[2] by Canadian Armed Forces LCDR Michael Bielby, who at all relevant times was posted to the Canadian Joint Operations Center and whose duties included working with United States counterparts on big data systems designed to collect and analyze data related to maritime domain awareness. (Bielby Decl. ¶¶ 2-4, ECF No. 135-12.) In that capacity, LCDR Bielby worked with NMIO personnel, including Mr. Boone and CAPT Westfall. (*Id.* ¶¶ 5, 9.) LCDR Bielby states in his Declaration that, in June 2019, a fellow military officer informed him that, "while attending a meeting at NMIO, . . ." Mr. Boone and CAPT Westfall "made highly derogatory statements" about Plaintiff in the presence of officials from the Privy Council. (*Id.* ¶¶ 11, 15.) LCDR Bielby further states in his Declaration that, in November 2019, at a conference involving "American, Canadian, British, Australian, and New Zealand officials involved in joint maritime national security operations," he personally overheard CAPT Westfall state that Plaintiff "had exaggerated her credentials, that she posed an insider threat, a national security risk, that her clearance had been revoked, and that she had been terminated for cause." (*Id.* ¶ 16.)

Mr. Boone and CAPT Westfall each deny that they made any such derogatory statements about Plaintiff. (*See* Boone's Answer to Interrog. No. 1, ECF No. 135-10; Westfall's Answers to Interrog. No. 1, ECF No. 135-9.)

As an initial matter, Plaintiff does not allege in the Amended Complaint that Mr. Boone was present at the June 2019 meeting and/or made any derogatory statements about Plaintiff at a June 2019 meeting. The only defamation allegation against Mr. Boone that post-dates Plaintiff's

---

[2] The document is designated as an affidavit. However, it is not notarized; therefore, it is a declaration rather than an affidavit.

15

NMIO employment is that he told "senior Navy officials" that Plaintiff was having an extramarital affair. (Am. Compl. ¶ 137, ECF No. 114.) Mr. Boone has provided a sworn statement to the contrary (Boone's Answer to Interrog. No. 1, ECF No. 135-10) and Plaintiff has adduced no evidence to support that allegation.

Regardless of whether the Court credits LCDR Bielby's statements or Mr. Boone's and CAPT Westfall's statements, and even assuming for the sake of argument that Mr. Boone and CAPT Westfall made the alleged derogatory statements, Mr. Boone and CAPT Westfall would have been acting within the scope of their employment.

Per LCDR Bielby, CAPT Westfall's (and, according to him but not Plaintiff, Mr. Boone's) June 2019 statements were made at "a meeting at NMIO." (Bielby Decl. ¶ 11, ECF No. 135-12.) The conversation took place at CAPT Westfall's (and Mr. Boone's) duty station, and Plaintiff has provided no evidence that the conversation took place outside of duty hours. The conversation, therefore, was necessarily in furtherance of CAPT Westfall's (and/or Mr. Boone's) work for NMIO. *See Meron*, 929 F.3d at 165; *Sawyer*, 587 A.2d at 471 (cleaned up). Furthermore, CAPT Westfall (and Mr. Boone) would have been authorized to speak concerning Plaintiff's credentials, security status, and the reason Plaintiff was terminated because CAPT Westfall was Plaintiff's second-line supervisor at NMIO (and Mr. Boone was Plaintiff's first-line supervisor at NMIO). The conversation also was foreseeable because the meeting necessarily involved individuals connected to maritime intelligence integration as it took place at NMIO, Plaintiff also was a member of the maritime intelligence integration community, and Plaintiff had just left NMIO the month prior. *Sawyer*, 587 A.2d at 471. Discussion of the circumstances surrounding Plaintiff's departure, thus, would be expected to come up among fellow members of the same industry. Finally, Plaintiff has offered no evidence that such alleged remarks were personal to CAPT

Westfall (or Mr. Boone), were a departure from furthering NMIO's business, or were made in an effort to protect CAPT Westfall's (or Mr. Boone's) own interests. *See Meron*, 929 F.3d at 165; *Sawyer*, 587 A.2d at 471 (cleaned up).

Per LCDR Bielby, CAPT Westfall's November 2019 statements were made at a conference involving multiple countries' "joint maritime national security operations." (Bielby Decl. ¶ 16, ECF No. 135-12.) Thus, the conversation took place at a work-related conference attended by CAPT Westfall, and Plaintiff has provided no evidence that the conversation took place outside of duty hours. *See Meron*, 929 F.3d at 165; *Sawyer*, 587 A.2d at 471 (cleaned up). The conversation, therefore, was necessarily in furtherance of CAPT Westfall's work for NMIO. Furthermore, again, CAPT Westfall would have been authorized to speak concerning Plaintiff's credentials, security status, and the reason Plaintiff was terminated because CAPT Westfall was Plaintiff's second-line supervisor at NMIO. The conversation also was foreseeable because the meeting involved individuals connected to maritime security operations, Plaintiff also was a member of the maritime security operations community, and Plaintiff had just left NMIO earlier that year. *Sawyer*, 587 A.2d at 471. Discussion of the circumstances surrounding Plaintiff's departure, thus, would be expected to come up. Finally, Plaintiff has offered no evidence that such alleged remarks were personal to CAPT Westfall, were a departure from furthering NMIO's business, or were made in an effort to protect CAPT Westfall's own interests. *See Meron*, 929 F.3d at 165; *Sawyer*, 587 A.2d at 471 (cleaned up).

To be clear, Mr. Boone and CAPT Westfall deny making any of the above-referenced derogatory statements about Plaintiff. Even if the Court is convinced otherwise or would prefer to give Plaintiff the benefit of the doubt, however, such statements would have been within the scope of Mr. Boone's and CAPT Westfall's employment by NMIO because they took place at their duty

station or temporary duty station, there is no evidence they were made outside of duty hours, and there is no evidence that they were purely personal in nature. The Court, therefore, should deny Plaintiff's Motion with respect to his claim.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny Plaintiff's Motion.

Respectfully submitted,

Erek L. Barron
United States Attorney


By: */s/ Kelly M. Marzullo*
Kelly M. Marzullo (Bar No. 28036)
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4956 (direct)
(410) 962-2310 (fax)
kelly.marzullo@usdoj.gov
