## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **LILIAN ALESSA,** | * | |
| **Plaintiff,** | * | |
| | | **Civ. No. DLB-21-0924** |
| **v.** | * | |
| | * | |
| **JOHN PHELAN,** | * | |
| *et al.* | | |
| | * | |
| **Defendants.** | * | |

## MEMORANDUM OPINION

In June 2018, the Navy hired Dr. Lillian Alessa to provide expertise and program management for its big data initiatives. In May 2019, the Navy terminated her employment. Alessa sued the Navy for gender and religious discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). The Court previously dismissed the hostile work environment claim and part of the retaliation claim. Defendant John Phelan, Secretary of the Navy ("the Navy"), move to dismiss Alessa's remaining Title VII claims or, in the alternative, for summary judgment on the claims.[1] For the following reasons, the Navy's motion, treated as a motion to dismiss, is granted in part and denied in part.

## I.    Background

### A.  The Facts

These are the relevant facts alleged in Alessa's amended complaint. Alessa, a professor at the University of Idaho, is an expert in data analytics used in the realm of national security. ECF 114, ¶ 2. She has worked with the U.S. military and national intelligence agencies. *Id.*

---

[1] Alessa names the Secretary of the Navy as a defendant. John Phelan was sworn in as Secretary of the Navy on March 25, 2025. Phelan is substituted for former Secretary Carlos Del Toro pursuant to Federal Rule of Civil Procedure 25(d). The Clerk shall update the docket.

On April 1, 2018, Rear Admiral Robert Sharp, then-Director of the National Maritime Intelligence-Integration Office ("NMIO") and Commander of the Office of Naval Intelligence ("ONI"), proposed hiring Alessa to serve as Special Advisor to the NMIO Director in ONI and Program Manager for the Big Data, Advanced Analytics for Decision Support ("BDAADS") initiative. *Id.* ¶¶ 47–48. Under Sharp's proposal, the Department of the Navy would hire Alessa under the Intergovernmental Personnel Act of 1970, 5 U.S.C. § 3371, *et seq.* ("IPA"). *Id.* ¶ 49. Todd Boone, then-Director of Intelligence Integration at NMIO, prepared the paperwork for an IPA agreement, proposing, at the direction of senior personnel, that Alessa serve as both Senior Advisor to the Director of NMIO for Data Science and Program Manager for the BDAADS initiative. *See id.* ¶¶ 20, 50–51. Following significant review, an IPA agreement between Alessa and the Navy took effect on June 7, 2018. *Id.* ¶¶ 52, 55. Alessa served as a Defense Intelligence Senior Level (DISL)-equivalent Special Advisor for Data Science and a Program Manager for Advanced Data and Analytics with the Department of Defense. *Id.* ¶¶ 35, 57. The agreement specified that Alessa would report to Sharp, but instead, Alessa was directed to work with Boone, who reported to Captain Edward Westfall of the U.S. Coast Guard, Deputy Director of NMIO. *Id.* ¶¶ 62–63.

When Alessa began working with Boone, he talked to her about "his attitudes towards women." *Id.* ¶ 67. Boone "openly stated that women should be limited from being in the workplace and that it was an error that they were required to be there." *Id.* ¶ 68. He indicated he could protect women in the workplace and "made it clear" that he believed female employees should be restricted to support roles. *Id.* Shortly after meeting Alessa, Boone sent her a message that stated, "you are a Princess in God's Kingdom and I am God's Knight." *Id.* ¶ 175. Boone told Alessa that women should rely on his guidance, advising Alessa that she could only trust Boone and could

rely only on him for the truth. *Id.* ¶¶ 69–70. Boone did not make these kinds of comments to Alessa's male colleagues. *Id.* ¶¶ 73, 180. He also stated in a report to the Naval Investigative Service and the Department of Defense Inspector General that he protected certain female NMIO employees who conformed with his views on gender roles. *Id.* ¶ 71.

In August 2018, Alessa coordinated a workshop for stakeholders in Dublin, California. *Id.* ¶ 76. During and after the workshop, participants complained about the performance of Honey Elias, another woman who worked with Boone and whom Boone had invited to participate in the workshop. *Id.* ¶¶ 76–77. Elias is "apparently Christian." *Id.* ¶ 78. Boone, a Protestant Christian, and Westfall were aware that Alessa is a non-practicing, non-evangelical Christian. *Id.* ¶¶ 195–97, 221.

On September 5, 2018, Alessa held a meeting to discuss Elias and her negative impact on the BDAADS program. *Id.* ¶ 78. During the meeting, Boone told Alessa that Elias was "under his protection" and that she "behaved." *Id.* Alessa disagreed with Boone, contending that Elias was not a good fit for BDAADS. *Id.* ¶ 79. As participants left the meeting, Boone grabbed Alessa's arm and said, "I made you and I can break you." *Id.* Later, Boone apparently changed his behavior towards Elias when she stopped "behaving" and wanted to see Elias punished. *Id.* ¶¶ 82, 181. Boone also stated that his treatment of Alessa changed when she was not willing to accept his protection. *Id.* ¶ 81.

On September 19, 2018, Alessa reported the incident where Boone grabbed her arm to Boone's immediate supervisors: Westfall and Commander Andre Wilson, NMIO Chief of Staff. *Id.* ¶¶ 83, 86. She also told Christopher Randall, Assistant Director for Command Security in ONI, and she later submitted a written complaint to Randall. *Id.* ¶¶ 84–85. Alessa told Westfall, Wilson, and Randall that she believed Boone was a threat to her physical safety. *Id.* ¶¶ 83–84. On

September 24, 2018, Sean Moon, a Department of Homeland Security employee who supported the BDAADS program, also told Westfall and Wilson about Boone's behavior toward Alessa. *Id.* ¶ 86. The same day, Westfall told Alessa and Moon that he would investigate and follow up with them, but neither Alessa nor Moon was interviewed and they were not advised of any investigation results. *Id.* ¶¶ 87–88. Westfall also told Alessa to continue working with and under Boone on her projects. *Id.* ¶¶ 90–92. Both Westfall and Boone prevented Alessa from meeting with Sharp without their permission. *Id.* ¶ 94.

At an October 11, 2018 meeting to discuss coordination between BDAADS and the NMIO Maritime Security Division, John Sanford, the Director of the Maritime Security Division and one of Westfall's subordinates, said to Alessa, "what would a little girl know anyway?" *Id.* ¶ 97. After Alessa complained to Westfall about this comment, he apparently took no action. *See id.* ¶ 98. On December 2, 2018, Westfall asked Alessa to remove her title from her email signature, telling her it was "inappropriate" and not "humble," even though male employees used similar titles in their correspondence. *Id.* ¶ 99.

Boone locked Alessa out of assignments and meetings, withheld resources she needed to do her job, replaced her office phone number in the official address book with his own, directed Alessa to provide him with her home address and detailed travel records, and directed other employees to report to him about Alessa's attendance and actions at meetings. *Id.* ¶¶ 93, 95. He later falsely represented that Alessa had not obtained proper approval to designate team members to her project and sought to deny her travel approval. *Id.* ¶¶ 106–09. On January 7, 2019, Boone prevented Alessa, a management official, from participating in a management discussion, indicating that her presence would interrupt "leadership" from "do[ing] its job." *Id.* ¶ 103. Boone did not withhold information or try to undermine Alessa's male colleagues. *Id.* ¶¶ 183–84.

On January 8, 2019, Alessa learned that the BDAADS program was fully funded, making it a national program of record. *Id.* ¶ 101. Sharp, who had lauded Alessa and the BDAADS program and wrote a letter of recommendation for Alessa to receive an award, publicly congratulated Alessa when she secured this funding. *Id.* ¶¶ 129–30. However, the program funding could not be distributed to NMIO because Boone had required the proposal to be routed through him. *Id.* ¶ 102. In January 2019, Boone began preparing to terminate Alessa. *Id.* ¶ 104.

Alessa filed an informal complaint with the Equal Employment Opportunity ("EEO") Office on March 15, 2019. *Id.* ¶ 113. Soon after Alessa filed her EEO Complaint, a staffing package prepared by Boone, recommending Alessa's termination, was passed "rapidly" from Westfall to Rear Admiral Gene Price, who had replaced Sharp as ONI Commander and NMIO Director on January 24, 2019. *Id.* ¶¶ 105, 114. The same afternoon, Price suspended all government employee activity in support of the BDAADS program ("stop-work order"), which effectively shut down the program. *Id.* ¶ 115. On April 2, 2019, Alessa found out that she was banned from NMIO spaces due to the stop-work status of BDAADS. *Id.* ¶ 116. She then had travel requests for work unrelated to BDAADS denied by Westfall and Wilson. *Id.* ¶ 117. On April 23, 2019, Westfall and Wilson directed a staff member, Christopher Hickey, to inform a potential program partner that they should not communicate with Alessa regarding an upcoming meeting. *Id.* ¶ 120. On May 6, 2019, Alessa discovered that she had been locked out of her account on the Total Workforce Management System. *Id.* ¶ 123.

After learning about Alessa's EEO complaint, Price consulted Boone and Westfall. *Id.* ¶ 119. On May 10, 2019, Price told Alessa that the Navy was terminating the IPA agreement and Alessa's employment with the Navy because NMIO was not the proper place for the BDAADS program. *Id.* ¶ 124. The contract reevaluation period was more than 13 months away. *Id.* Price told

Alessa that he "frankly didn't know much" about the program itself. *Id.* ¶ 125. In an email to the University of Idaho, Price communicated that the IPA agreement was terminated, effective May 15, 2019. *Id.* ¶ 127. Between the March 15 stop-work order and the termination of the IPA agreement and Alessa's employment, Price did not consult with Alessa about the BDAADS program. *Id.* ¶ 125.

After her termination, Alessa lost her titles of DISL-equivalent Special Advisor and Program Manager for Advanced Data and Analysis with the Department of Defense. *See id.* ¶ 35. She also lost $90,000 in salary and was denied a 10 percent pay increase. *Id.* ¶ 165.

### B. Procedural History

After Alessa filed her March 15, 2019 EEO complaint, her counsel received notice of Alessa's right to file a formal complaint on June 17, 2019. *Id.* ¶ 27. Alessa filed her formal complaint on July 2, 2019, alleging gender and religious discrimination, retaliation and reprisal, hostile work environment, and wrongful termination. *Id.* ¶¶ 28–29. The Navy acknowledged receipt of the formal complaint on July 15, 2019. *Id.* ¶ 30. On January 27, 2020, after a 180-day investigation period and a 30-day extension by the Navy, the agency transmitted the Report of Investigation. *Id.* ¶¶ 32–33. Alessa's counsel received the report on February 4, 2020. *Id.* ¶ 33.

On May 18, 2020, Alessa filed her complaint in the U.S. District Court for the District of Columbia. She asserted Title VII claims of gender discrimination, religious discrimination, retaliation, and hostile work environment, and defamation claims against Westfall and Boone. ECF 1. The defendants moved to dismiss the state law claims and to transfer the Title VII claims to the District of Maryland. ECF 6. The District Court for the District of Columbia granted the defendants' motion in part, transferring the case in its entirety to the District of Maryland on March 31, 2021. ECF 11.

On May 19, 2023, the Navy moved to dismiss or, in the alternative, for summary judgment on Alessa's Title VII claims. ECF 84. During a February 21, 2024 hearing, the Court granted in part and denied in part the Navy's motion, dismissing the gender and religious discrimination claims and hostile work environment claim without prejudice and dismissing the retaliation claim as to allegations of retaliation based on September 2018 protected activity. *See* ECF 109 & 110. The Court also granted Alessa's oral motion for leave to amend her gender and religious discrimination claims. *See* ECF 109 & 110.

Alessa filed an amended complaint on March 8, 2024. She alleges gender discrimination (Count I), religious discrimination (Count II), gender and religious discrimination (Count III), retaliation (Count IV), hostile work environment (Count V), and defamation (Counts VI & VII).[2] ECF 114. On April 5, 2024, the Navy moved to dismiss the discrimination claims or, in the alternative, for summary judgment. ECF 118. The motion is fully briefed. ECF 118, 124, 128. No hearing is necessary. Loc. R. 105.6 (D. Md. 2023).[3]

## II.    Standard of Review

The Navy's motion is styled as a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. "A motion styled in this manner implicates the Court's

---

[2] The Court previously dismissed Count V and did not grant Alessa leave to amend. In a footnote in her amended complaint, Alessa notes that she retains the dismissed count in the amended complaint "for the sake of a complete record." ECF 114, at 43 n.4. In her opposition to the motion to dismiss, Alessa explains that she simply did not strike the allegations in her amended complaint and that she "does not dispute the Court's earlier ruling[]." ECF 124, at 3–4 n.1. Just so there is no confusion: Count V of Alessa's amended complaint has been dismissed for failure to state a claim.

[3] Alessa's complaint originally named Boone and Westfall as the defendants for her defamation claims. ECF 1. The United States has been substituted as the defendant for those claims pursuant to a certification under the Westfall Act, 28 U.S.C. § 2679(d), that Boone and Westfall were acting within the scope of their employment at the time of the alleged defamation. *See* ECF 110, ¶ 1; ECF 6-1. Alessa has challenged the Westfall Act certification and asked the Court to reinstate Boone and Westfall as defendants for her defamation claims. *See* ECF 135. The Court resolves Alessa's challenge to Westfall Act certification in a separate opinion.

discretion under Rule 12(d)." *Mattice v. Bell*, No. GLR-19-1524, 2020 WL 1505622, at *5 (D. Md. Mar. 30, 2020) (citing *Kensington Volunteer Fire Dep't, Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012)). Under Federal Rule of Civil Procedure 12(d), when ruling on a motion to dismiss, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "There are two requirements for a proper Rule 12(d) conversion." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (en banc). First, "all parties [must] be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment." *Id.* (quoting *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)). Second, "the parties first [must] 'be afforded a reasonable opportunity for discovery.'" *Id.* (quoting *Gay*, 761 F.2d at 177); *see also* Fed. R. Civ. P. 12(d) ("All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."). Summary judgment without a reasonable opportunity for relevant discovery "forces the non-moving party into a fencing match without a sword or mask." *See McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014).

A non-moving party may file a Rule 56(d) affidavit detailing the specific facts that are yet to be discovered and are necessary to defeat summary judgment. *See Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Rule 56(d) motions are "broadly favored and should be liberally granted" in order to protect non-moving parties from premature summary judgment motions. *See Greater Balt. Ctr. for Pregnancy Concerns*, 721 F.3d at 281 (quoting *Raby v. Livingston*, 600 F.3d 552, 561 (5th Cir. 2010)). To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be "essential to . . . [the] opposition." *See* Fed. R. Civ. P. 56(d). A nonmoving party's Rule 56(d) request for additional discovery is

properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *See Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995).

Alessa has filed a Rule 56(d) affidavit seeking additional discovery concerning "[h]ow the decision to stop work on BDAADS arose, including Price's awareness of Plaintiff's EEO activity, who spoke with Price, what documents he reviewed, what communications he received that day concerning Plaintiff, and from whom[,]" and "[h]ow the decision to terminate the IPA agreement arose, including Price's investigation of NMIO staff complaints, the results and impact of that investigation, whom Price consulted, and what documents he reviewed in his decision process[.]" ECF 103-4, ¶ 9. This information is "essential" to Alessa's opposition; without it, Alessa cannot respond to the government's arguments that Price independently decided to stop work on the BDAADS program and terminated the IPA agreement after an independent investigation. Alessa's affidavit specifically identifies discovery essential to respond to the Navy's motion for summary judgment.

Because Alessa has demonstrated a need for additional discovery, the Court treats the Navy's motion as a motion to dismiss and declines to look outside the pleadings.

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that a

defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Baltimore County*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)). The Court considers the complaint "in its entirety." *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021) (quoting *Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018)).

## III. Discussion

### A. Disparate Treatment Claims

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). In a discrimination

action under Title VII, the plaintiff ultimately bears the burden of showing that "her employer discriminated against her because of a protected characteristic." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir. 1998). To carry this burden, a plaintiff can "provide supporting evidence through one of two methods: (1) 'direct or circumstantial evidence' that discrimination motivated the employer's adverse employment decision, or (2) the *McDonnell Douglas* 'pretext framework' that requires the plaintiff to show that the employer's stated permissible reason for taking an adverse employment action 'is actually a pretext for discrimination.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 n.8 (4th Cir. 2020) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *see also Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

A plaintiff relying on the burden-shifting "pretext framework" established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must first make out a "prima facie" case of discrimination. "[T]he elements of a prima facie case of discrimination under Title VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class," *Coleman*, 626 F.3d at 190, or "circumstances that raise a reasonable inference of unlawful discrimination," *Bing*, 959 F.3d at 616 n.8 (quoting *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995), *as amended* (June 9, 1995), *as amended* (Mar. 14, 2008)); *see also Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 544–45 (4th Cir. 2003).

"[A] plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss." *Coleman*, 626 F.3d at 190 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–15 (2002)). "[A] plaintiff need only plead facts supporting a reasonable inference

of discriminatory intent." *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 471 (4th Cir. 2025) (citing *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 586 (4th Cir. 2015)). However, a Title VII plaintiff must "allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing*, 959 F.3d at 617 (quoting *Coleman*, 626 F.3d at 190). And although Alessa need not plead each element of a prima facie case to survive the Navy's motion to dismiss, "the elements of a prima facie case are a helpful guide in assessing the adequacy of the allegations." *Niner v. Garrett Cnty. Pub. Works*, No. ELH-17-2948, 2018 WL 3869748, at *16 (D. Md. Aug. 15, 2018).

### 1. Gender Discrimination

The Navy moves to dismiss Alessa's gender discrimination claim. The Navy does not dispute that Alessa has adequately pled that she is female and a member of a protected class, *see* ECF 114, ¶ 172, or that she had satisfactory job performance, *see, e.g., id.* ¶¶ 101, 129–30. Instead, the Navy argues Alessa has not plausibly alleged that she suffered an adverse employment action taken by a decisionmaker with discriminatory animus. The Court disagrees. Alessa has plausibly alleged an adverse employment action, circumstances that give rise to an inference of unlawful gender discrimination, and discriminatory animus imputable to the ultimate decisionmaker. The Navy's motion to dismiss Alessa's gender discrimination claim is denied.

### a. Adverse Employment Action

As the Court held in its February 21, 2024 ruling on the Navy's first motion to dismiss, Alessa has plausibly alleged that the decision to terminate the IPA agreement was an adverse employment action. *See* Hr'g Tr. 36:25–38:2. The ruling was based, in large part, on the Fourth Circuit's decision in *Boone v. Goldin*, 178 F.3d 253 (4th Cir. 1999), *abrogated in part by Muldrow v. City of St. Louis*, 601 U.S. 346 (2024). Under *Boone*, "typical requirements for a showing of an

'adverse employment action' that can support a Title VII claim" include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion[.]" 178 F.3d at 255. In her amended complaint, Alessa alleges that the termination of the IPA agreement resulted in the loss of a job title, ECF 114, ¶ 35, and a loss of $90,000 in salary and denial of a 10 percent pay increase, *id.* ¶ 165. Thus, as she did previously, Alessa has plausibly alleged that the termination of the IPA agreement constitutes an adverse employment action under *Boone*.

Since the Court's February 2024 ruling, the Supreme Court decided *Muldrow v. City of St. Louis*, 601 U.S. 346, a case that addressed adverse employment actions in Title VII cases. *Muldrow* does not change this Court's finding that the termination of the IPA agreement was an adverse employment action. In *Muldrow*, the Supreme Court considered whether an employee's transfer to a different position was actionable under Title VII. Jatonya Clayborn Muldrow, a police officer in St. Louis, brought a Title VII claim against the city. *Id.* at 350. Muldrow alleged that she was transferred to a less desirable job in the police department she is a woman. *Id.* at 350–52. In her former position, Muldrow worked as a plainclothes officer in a specialized intelligence division of the department. *Id.* at 350. Her position allowed her to serve as a task force officer within the FBI, a spot that garnered her an "unmarked take-home vehicle," FBI credentials, and the authority to conduct investigations beyond St. Louis. *Id.* In her new position, Muldrow retained her rank and pay, but she became a uniformed officer entrusted with a different set of duties, including administrative tasks and patrol. *Id.* at 351. Muldrow also lost her FBI status and associated perks, such as the car, and had a less regular work schedule that included some weekends. *Id.* The district court granted summary judgment for the city because Muldrow had not shown that her transfer led to a "material employment disadvantage." *Id.* at 352 (quoting *Muldrow*

*v. City of St. Louis*, No. 4:18-CV-02150, 2020 WL 5505113, at *8 (E.D. Mo. Sept. 11, 2020), *vacated & remanded*, 601 U.S. 346). The district court reasoned that Muldrow retained the same rank and salary and experienced only minor changes in her work duties and perks. *Id.* The Eighth Circuit affirmed. *Id.* The Supreme Court vacated the judgment below. *Id.* at 353. The *Muldrow* Court explained that courts have required Title VII plaintiffs to show more harm than the statute requires. *Id.* at 354–55. The Court held that Muldrow only had to "show some harm respecting an identifiable term or condition of employment." *Id.* at 355. That harm did not have to be "'significant[]' . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* (quoting *Muldrow v. City of St. Louis*, 30 F.4th 680, 688 (8th Cir. 2022), *vacated and remanded*, 601 U.S. 346).

Thus, under *Muldrow*, "[t]o make out a Title VII discrimination claim, a [plaintiff] must show some harm respecting an identifiable term or condition of employment," but "does not have to show . . . that the harm incurred was 'significant.'" *See id.* at 354–55 (quoting *Muldrow*, 30 F.4th at 688). This holding abrogated *Boone*'s more stringent requirement that the employment action have a "significant detrimental effect." *See id.* at 355–56 (quoting *Boone*, 178 F.3d at 256) (citing *Boone* as an example of a case where "claims were rejected solely because courts rewrote Title VII, compelling workers to make a showing that the statutory text does not require"). Thus, if the termination of the IPA agreement constituted an adverse employment action under *Boone* before *Muldrow*, it easily clears *Muldrow*'s lower bar. Alessa has plausibly alleged that the IPA agreement termination was an adverse employment action.

### b. Inference of Unlawful Discrimination

### i. Boone's Discrimination

Alessa can prevail on her gender discrimination claim by showing either "different treatment from similarly situated employees outside the protected class," *Coleman*, 626 F.3d at 190–91 (4th Cir. 2010), or "circumstances that raise a reasonable inference of unlawful discrimination," *Bing*, 959 F.3d at 616 n.8 (quoting *Ennis*, 53 F.3d at 58); *see also Bryant*, 333 F.3d at 544–45. "[S]ex stereotyping constitutes discrimination on the basis of gender for purposes of Title VII." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 617 n.15 (4th Cir.), *as amended* (Aug. 28, 2020) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989), *superseded on other grounds by* 42 U.S.C. § 2000e-2(m)); *see also Price Waterhouse*, 490 U.S. at 250 ("[A]n employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.").

As the Court explained in its February 2024 ruling, Alessa adequately pled in her original complaint facts that raise an inference of unlawful gender discrimination. *See* Hr'g Tr. 83:18–84:7. Alessa's amended complaint also meets the Rule 8 pleading standard. She alleges that Boone told her about his attitude towards women and that he believed that women should be restricted from being in the workplace or limited to support roles. He said that only he could protect women from men in the workplace and "constantly advised Dr. Alessa she could only trust him and that women in general needed to rely on his guidance." ECF 114, ¶ 69. Boone also expressed, in a report to the Naval Investigative Service and the Department of Defense Inspector General, that he had the role of protecting certain female NMIO employees who conformed to his views on gender roles. At one point, Boone told Alessa "you are a Princess in God's Kingdom and I am God's Knight." *Id.* ¶ 175. Boone stated that his treatment of Alessa changed when she was no longer willing to accept

his protection. When Alessa disagreed with Boone during a meeting, he grabbed her arm and said, "I made you and I can break you." *Id.* ¶ 79. Boone locked her out of meetings and assignments, cut her off from resources needed to do her job, replaced her phone number in the official address book with his own, directed other employees to report on her actions and attendance at meetings, and refused to include her in management discussions despite her managerial role. Boone did not withhold information from or seek to undermine Alessa's male colleagues. His treatment of other female employees depended on whether they conformed with Boone's expectations of women in the workplace. He characterized Honey Elias, another woman whom he worked with, as "under his protection" because she "behaved" and sought to advance Elias's career. *Id.* ¶ 78. However, when Elias stopped "behaving," as Boone saw it, Boone wanted to see Elias punished. And Alessa alleges that, after beginning preparations to terminate Alessa in January 2019, Boone put together a staffing package recommending her termination.

Based on these allegations, Alessa has plausibly alleged that Boone expressed stereotypical views about the role of women in the workplace. The Court can reasonably infer from Alessa's allegations that Boone pushed for her termination because she did not conform with his gender stereotypes—a form of unlawful gender discrimination under Title VII.

### ii.    Cat's Paw Liability

Alessa has plausibly alleged that Boone acted with discriminatory animus. He took steps to get Alessa terminated because she did not conform to his gender stereotypes. But Boone did not make the final decision to terminate Alessa's IPA agreement. Price did. The Navy argues that, if Boone had discriminatory animus, it cannot be imputed to Price. The Court disagrees.

The Fourth Circuit has held that "Title VII . . . do[es] not limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer," because "[s]uch a

16

construction of th[is] discrimination statute[] would thwart the very purpose[] of the act[] by allowing employers to insulate themselves from liability simply by hiding behind the blind approvals, albeit non-biased, of formal decisionmakers." *Hill*, 354 F.3d at 290. Under the "cat's paw" theory of liability,

> When a formal decisionmaker acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate, it is not inconsistent to say that the subordinate is the actual decisionmaker or the one principally responsible for the contested employment decision, so long as he otherwise falls within the parameters of the discrimination statute's definition of an employer or agent of the employer.

*Id.* Formal decisions cannot be attributed to "a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision." *Id.* at 291. But "evidence that a supervisor who was not the formal decisionmaker 'performed[] an act motivated by [discriminatory] animus that [was] *intended* by the supervisor to cause an adverse employment action' could support a finding of discrimination 'if that act [was] a proximate cause of the ultimate employment action.'" *Lim v. Azar*, 310 F. Supp. 3d 588, 602 (D. Md. 2018) (second, third, and fourth alterations in original) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 & n.3 (2011)).

In *Gamble v. Charles County*, the court determined that a Title VII plaintiff "pleaded a sufficient factual basis" to impute his supervisor's alleged racial animus to the "ultimate decisionmaker." No. PWG-20-3126, 2021 WL 3491823, at *5 (D. Md. Aug. 9, 2021). Aaron Gamble, a police recruit, alleged he was terminated after his immediate supervisor, Master Corporal Joseph Piazza, accused him of cheating on a written CPR test. *Id.* at *1–2. Prior to the accusation, Gamble had complained to internal affairs about Piazza's conduct, including his offensive statements and use of racial epithets. *Id.* at *2. The "ultimate decisionmaker" in

Gamble's termination was Sheriff Troy D. Berry. *Id.* at *4. Gamble's termination occurred the same day that Piazza accused him of cheating, and there was little if any investigation into whether Gamble was cheating before his termination. *Id.* at *5. The court determined that "[t]his sequence of events permits the reasonable inference in Mr. Gamble's favor that Sheriff Berry was aware of these occurrences and simply rubber stamped Plaintiff's dismissal" at Piazza's insistence. *Id.* Although "[a] jury may see things differently," the court found these allegations were "enough to allow the claims against Sheriff Berry to proceed under a cat's paw theory." *Id.*

As in *Gamble*, Alessa has pled a "sequence of events permit[ting] the reasonable inference" that Price's termination of the IPA agreement "simply rubber stamped [her] dismissal" at Boone's insistence. *See id.* at *5. Alessa alleges that Boone told her in September 2018, "I made you and I can break you," ECF 114, ¶ 79, and that Boone began preparations to terminate her in January of 2019. He created a staffing package recommending Alessa's termination, which passed "rapidly" from Westfall to Price. *Id.* ¶ 114. The same afternoon Price received the recommendation to terminate Alessa, Price made the decision to stop work on the BDAADS program, "effectively shut[ing] down the program." *Id.* ¶¶ 114–15. Less than two months later, more than 13 months before the contract reevaluation period, Price terminated the IPA agreement. In the two months between the stop-work order and Alessa's termination, Price consulted with Boone and Westfall about the BDAADS program; he never consulted with Alessa. And when Price told Alessa that he was terminating the IPA agreement, Price admitted to her that he "frankly didn't know much" about the BDAADS program. *Id.* ¶ 125.

Alessa has plausibly alleged that Boone had more than a "substantial influence" on the decision to terminate her and that he played more than a "significant" role in her termination. *Hill*, 354 F.3d at 291. Boone allegedly recommended her termination to Price because she was a woman

who did not conform to his views on gender roles in the workplace. On Boone's recommendation, Price, who knew little about the BDAADS program, issued the stop-work order and ultimately terminated the IPA agreement without speaking to Alessa, who managed BDAADS. These allegations suggest that Price effectively rubber-stamped Boone's recommendation to terminate Alessa.[4] Drawing all reasonable inferences from the allegations in Alessa's favor, she has pled that Boone "performed[] an act motivated by [discriminatory] animus that [was] *intended* by [Boone] to cause an adverse employment action" and that this act "[was] a proximate cause of the ultimate employment action." *Lim*, 310 F. Supp. 3d at 602 (second, third, and fifth alterations in original) (quoting *Staub*, 562 U.S. at 422 & n.3). Although "[a] jury may see things differently," at this stage, Alessa has pled that Boone's discriminatory animus may be imputed to Price, the "ultimate decisionmaker." *Gamble*, 2021 WL 3491823, at *5.

Alessa has plausibly alleged an adverse employment action—the termination of her IPA agreement—and that the action was taken because of unlawful gender discrimination. The Court denies the Navy's motion to dismiss Alessa's gender discrimination claim.[5]

---

[4] Because the Court treats the Navy's motion as a motion to dismiss and not a motion for summary judgment, it will not consider the statements in Price's declaration concerning his decision-making process for the stop-work order or the IPA agreement termination. Alessa has requested discovery on Price's reason for terminating the IPA agreement. *See* ECF 103-4, ¶ 9.

[5] Alessa asserts that Westfall also acted with discriminatory animus that can be imputed to Price. She alleges that Westfall requested that Alessa remove part of her job title from her email signature because it was "inappropriate" and not "humble" to include the designation, even though other male employees at NMIO used the same designation in their correspondence. ECF 114, ¶ 99. Alessa also alleges that Westfall knew about Boone's behavior towards her; that she complained to Westfall directly; that Westfall took no action and required Alessa to continue to work with Boone; and that Westfall did respond to complaints from her male colleague. *Id.* ¶¶ 86–92, 97–98, 188. The Court need not decide if these allegations give rise to an inference of unlawful gender discrimination by Westfall because Alessa alleges that it was Boone who created the staffing package that recommended Alessa's termination, which "was rapidly passed by . . . Westfall to . . . Price." *Id.* ¶ 114. Alessa has not plausibly alleged that Westfall's purported discriminatory animus can be imputed to Price.

### 2. Religious Discrimination Claim

The Navy also seeks dismissal of Alessa's religious discrimination claim. Once again, the Navy argues that Alessa has not pled an adverse employment action motivated by discriminatory animus. This time, the Court agrees with the Navy. Alessa's religious discrimination claim is dismissed.

"To prove a Title VII claim [of religious discrimination] under a disparate treatment theory, a plaintiff 'must demonstrate that the employer treated her differently than other employees because of her religious beliefs.'" *Barnett*, 125 F.4th at 471 (emphasis removed) (quoting *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1017 (4th Cir. 1996)). Title VII "broadly defines religion as 'all aspects of religious observance and practice, as well as belief.'" *Id.* at 470 (quoting 42 U.S.C. § 2000e(j)). For example, an employer who offers a religious exemption for vaccine requirements to an employee from one religion and denies the same exemption to an employee from a different religion has "treated [the employee] differently than other employees because of her religious belief." *Id.* at 472. Discriminatory animus can be demonstrated by comments about an employee's religion or religious practice. *See, e.g.*, *Hammoud v. Jimmy's Seafood, Inc.*, 618 F. Supp. 3d 219, 234 (D. Md. 2022) (denying motion to dismiss Title VII religious discrimination claim where plaintiff alleged "[their employer] repeatedly criticized [the plaintiff and her sister] based on the fact that they were behaving improperly as Muslim women"). If Alessa does not "establish a plausible basis for believing" that she experienced "different treatment from similarly situated employees outside the protected class" or "that [religion] was the true basis for [Alessa's] termination," her religious discrimination claim must be dismissed. *See Coleman*, 626 F.3d at 190–91; *Bing*, 959 F.3d at 616.

Alessa's religious discrimination claim fails because she has not plausibly alleged that anyone discriminated against her because of her religion. In her amended complaint, Alessa alleges, in conclusory terms, that Boone discriminated against her based on her religious beliefs. *See* ECF 114, at ¶¶ 7, 74, 113, 119, 161, 198, 205–06, 208, 214, 216. She says that Boone's statements about religion and gender "are direct evidence of religious discrimination and sex discrimination." *Id.* ¶ 74. Alessa alleges she is a non-practicing, non-evangelical Christian, that Boone is a Protestant Christian, and that Boone and Westfall were "aware" of Alessa's religious beliefs. *Id.* ¶¶ 195–97, 221. But Alessa does not plausibly allege that Boone or Westfall treated her differently because of her religious beliefs, let alone that she was terminated because of her religious beliefs.

The only fair reading of Alessa's allegations is that Boone discriminated against her because of *his* religious beliefs. On Alessa's account, Boone's religious beliefs informed his stereotypical views on gender and motivated his gender discrimination against her. *See id.* ¶¶ 7, 67, 69, 72, 79–80, 92–93, 104, 200. Boone "proselytiz[ed]" to her about "*his* attitudes towards women" and "*his* view of federal workers and *his* belief they were arrayed against him, in part because of *his* faith." *Id.* ¶ 67 (emphasis added). These and other statements by Boone are not, as Alessa contends, direct evidence that he held animus towards her because of *her* religious beliefs. In addition to making comments about his religious views, Alessa says Boone treated her differently because she did not "share *his* religious views." *See id.* ¶ 206 (emphasis added). Alessa alleges that in January 2019, Boone "began preparing to terminate [her] because she had proven not to agree with *his* religiously-motivated views of gender in the workplace and had refused to adopt the subservient role he deemed proper." *Id.* ¶ 104 (emphasis added); *see also id.* ¶¶ 7, 79–

80, 93, 200. Alessa does not connect any of Boone's words or behavior to *her* religious beliefs. Alessa does not plausibly allege that Boone discriminated against her because of her religion.

Alessa attempts to allege religious discrimination by comparing Boone's treatment of her to his more favorable treatment of another female colleague, Elias, a Christian who—for at least a period of time—conformed to Boone's religiously motivated views on gender. *See id.* ¶¶ 78, 203. But this comparison confirms the inescapable inference that Boone's treatment of women in the workplace was motivated by *his* religious views, not *their* religious views. For example, when Boone said he considered Elias as "under his protection" and that Elias "behaved," his statements were motivated by *his* religious beliefs, not Elias's religious beliefs. *Id.* ¶ 78. When Elias longer "behaved," Boone retaliated against her, suggesting that Boone's actions were motivated by *his* religious beliefs—not Elias's. *Id.* ¶¶ 78–79, 82, 181. The only reasonable inference to draw from these allegations is that Boone's treatment of Elias depended on whether she conformed with his religiously motivated gender stereotypes. When Elias did not "behave[]" as he believed a woman should, Boone treated Elias like he treated Alessa. *Id.* ¶¶ 79, 82. The comparison to Elias does not support an inference that Boone discriminated against Alessa because of Alessa's religious beliefs.

Other than allegations about the religious underpinnings of Boone's gender discrimination, Alessa makes only conclusory statements that Boone treated more favorably her colleagues who "accepted," "acquiesced," "remained silent," or "did not openly challenge" Boone's religious views. *See, e.g.*, *id.* ¶¶ 202, 207, 209. These allegations, too, center on Boone's religious beliefs— not the beliefs of Alessa or other similarly situated employees. They do not raise an inference that Boone discriminated against Alessa because of her religious beliefs.

Alessa's "allegations of [religious] discrimination do not rise above speculation." *See Coleman*, 626 F.3d at 191. She has not "establish[ed] a plausible basis for believing" that her

religion "was the true basis for [her] termination." *See id.* Alessa's religious discrimination claim is dismissed.

### 3. Gender and Religious Discrimination Claim

The Navy also seeks dismissal of Alessa's hybrid gender-and-religious discrimination claim. Alessa has not plausibly alleged discrimination based on her religion. Stripped of its inadequate religious discrimination allegations, this claim is entirely duplicative of Alessa's gender discrimination claim. While "[a] party may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count or defense or in separate ones," there is no alternative theory to gender discrimination alleged in Count III. *See* Fed. R. Civ. P. 8(d)(2). The gender discrimination claim alleged in Count III mirrors the gender discrimination claim in Count I. Therefore, the Court grants the motion to dismiss Alessa's hybrid gender and religious discrimination claim.

### B. Retaliation Claim

The Navy asserts that "[m]any" of Alessa's retaliation claims should be dismissed because she has not administratively exhausted them. ECF 118-1, at 17. The Court previously dismissed Alessa's retaliation claim to the extent it is predicated on her alleged protected activity in September 2018, *see* Hr'g Tr. 11:8–12:10, and held that the retaliation claim predicated on her March 2019 EEO complaint may go forward, *see id.* 39:4–41:5 The Court also held that the stop-work order and the IPA agreement termination are materially adverse actions causally connected to her March 2019 EEO complaint. *See id.* 32:20–35:8. The Court did not grant Alessa leave to amend her retaliation claim. The Court's prior rulings on the retaliation claim stand.

**IV.    Conclusion**

The Navy's motion to dismiss is granted in part and denied in part. The motion to dismiss Counts II and III of Alessa's amended complaint is granted. Counts II and III are dismissed with prejudice because Alessa was unable to cure the pleading deficiencies in her amended complaint. *See Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 269 (4th Cir. 2022) ("Where a plaintiff fails to state a claim in his amended complaint after having been 'advised with specificity of the legal deficiencies' in the initial complaint, dismissal with prejudice is appropriate." (quoting *Watkins v. Wash. Post*, No. PWG-17-818, 2018 WL 805394, at *8 (D. Md. Feb. 9, 2018)). The motion to dismiss is otherwise denied. A separate order follows.

Date: March 31, 2025

_____
Deborah L. Boardman
United States District Judge