## IN THE UNITED STATES DISTRICT COURT
## <u>FOR THE DISTRICT OF MARYLAND</u>

| | |
|---|---|
| LILIAN ALESSA, | * |
| Plaintiff, | * |
| v. | * |
| JOHN PHELAN, *et al.*, | * |
| Defendants. | * |

Civ. No. DLB-21-0924

### <u>MEMORANDUM OPINION</u>

Dr. Lillian Alessa asserts defamation claims based on the statements of two employees of the United States Navy ("Navy"), Todd R. Boone and Captain Edward A. Westfall. Alessa worked with Boone and Westfall when she served as an advisor and program manager for a Navy initiative related to big data and national security. In 2019, the Navy terminated the program and Alessa's employment. Alessa claims that, leading up to and after her termination, Boone and Westfall made defamatory statements about her to members of the intelligence community. Alessa sued Boone and Westfall for defamation in their individual capacities. The government certified under the Westfall Act, 28 U.S.C. § 2679(d)(1), that Boone and Westfall were acting within the scope of their employment at the time of the alleged defamatory statements, and the United States was substituted as the defendant for Alessa's defamation claims. Alessa challenges the Westfall Act certification that Boone and Westfall were acting within the scope of their employment. In her view, Boone and Westfall were acting outside the scope of their employment and they, not the United States, are the proper defendants for her defamation claims. For the following reasons, Alessa's motion to challenge Westfall Act certification is denied. The United States is the proper defendant for Alessa's defamation claims.

I.    **Background**

  **A.  Relevant Facts**

Beginning in June 2018, Alessa worked for the Navy's National Maritime Intelligence-Integration Office ("NMIO") through an agreement executed under the Intergovernmental Personnel Act of 1970, 5 U.S.C. § 3371, *et seq.* ("IPA"). ECF 135-1, at 3 (L. Alessa Resp. to 1st Interrog.); ECF 135-11, ¶ 3 (L. Alessa Aff.). She was hired to work on an initiative called Big Data, Advanced Analytics for Decision Support ("BDAADS"). *See* ECF 135-11, ¶ 4. Alessa also worked for the Department of Homeland Security ("DHS") under a separate IPA agreement. ECF 135-1, at 5.

Under her dual IPA agreements, Alessa worked with Sean Moon, a DHS employee who is listed as Alessa's DHS supervisor in one iteration of the IPA agreement with DHS. *See* ECF 135-3, at 2 (S. Moon Decl.); ECF 84-7, at 3. Alessa worked in Moon's chain of command for roughly four months. ECF 135-3, at 2. They continued to work together after she was no longer in his chain of command. *Id.* Alessa and Moon travelled together for work, and Alessa has occasionally stayed in Moon's home. *Id.* In late August or early September of 2018, NMIO staff raised concerns to Westfall about Alessa and Moon's conduct in the workplace, "specifically [that] Dr. Alessa and Mr. Moon had been touching each other during meetings, and Mr. Moon had been making sexually inappropriate comments." ECF 135-9, at 3 (E. Westfall Resp. to 1st Interrog.). This incident resulted in a counseling session for Alessa and Moon in September 2018. *See id.* at 3–4; *see also* 135-10, at 4 (T. Boone Resp. to 1st. Interrog.).

On March 15, 2019, while working for NMIO, Alessa filed a complaint with the Navy's Equal Employment Opportunity ("EEO") office, alleging workplace discrimination. ECF 114, ¶ 113. That same day, Rear Admiral Gene Price, the NMIO director, placed a stop work order on

the BDAADS program. ECF 135-1, at 3; ECF 114, ¶¶ 113–15. In May of 2019, Price terminated Alessa's IPA agreement with NMIO, ending her employment with the Navy. ECF 135-1, at 3. When the program ended, Boone, a department head for the Intelligence Integration Department at NMIO who also worked on the BDAADS program, was reassigned within NMIO to a nonsupervisory role. *See* ECF 136, at 13 (T. Boone Dep. 38:19–40:18).

As part of the investigation into Alessa's EEO complaint, Boone submitted a declaration where he answered 347 questions concerning Alessa's allegations. *See* ECF 135-5 (T. Boone EEO Decl.). In his declaration, Boone explained that he believed Alessa made improper requests to travel for work after the stop-work order issued on the BDAADS program and suggested that these requests could implicate the Antideficiency Act. *See* ECF 135-5, at 9, 34, 36–39. *See generally* ECF 136, at 13 (T. Boone Dep. 41:5–11) (describing the Antideficiency Act). Boone also raised concerns about Alessa staying at Moon's house while traveling for NMIO-related work. ECF 135-5, at 57.

On August 28, 2019, the DHS Office of the Inspector General ("OIG") informed the DHS Anti-Harassment Unit ("AHU") of an anonymous complaint that Moon and Alessa had engaged in a sexual relationship and that this relationship had a negative effect on the work environment. *See* ECF 135-6, at 2 (DHS AHU investigation report). The complainant, who identified themselves as a DHS Policy employee, indicated that Moon was Alessa's supervisor and provided dates and locations of the alleged affair. ECF 135-1, at 5. They alleged that the affair took place on dates that coincided with Alessa's travel to Washington, D.C., near Moon's residence in Derwood, Maryland, or when Alessa and Moon travelled elsewhere for work together. *Id.*; *see also* ECF 135-6, at 9. These dates were known by Boone, Westfall, Price, and NMIO Chief of Staff Andre Wilson. ECF 135-1, at 5. The DHS AHU opened up an investigation. ECF 135-6, at 2. After the

3

AHU completed fact finding in the investigation and closed the matter, the unit reported that "[t]he source of the instant anonymous complaint is undetermined." *Id.* at 11.

In June 2019, following Alessa's termination from the Navy, Captain Edward Westfall attended a meeting hosted at NMIO ("June 2019 NMIO meeting"). *See* ECF 135-11, ¶ 7. Michael Bielby, a member of the Canadian Armed Forces, heard from a fellow military officer who attended the meeting that Westfall had described Alessa as a national security risk, mentally unstable, and an insider threat, and that he indicated Alessa had overstated her abilities and credentials, was a poor performer, and that her security clearance to access classified information had been revoked. ECF 135-12, ¶¶ 2, 11–12 (M. Bielby Aff.). In November 2019, at a Five Eyes Maritime Domain Awareness Conference hosted in Australia ("November 2019 conference"), Bielby personally overheard Westfall make similar statements: that Alessa had exaggerated her credentials, that she was an insider threat and national security risk, that her security clearance had been revoked, and that she was terminated for cause. *Id.* ¶ 16.

### B.  Relevant Procedural History

Alessa sued Boone, Westfall, and the Secretary of the Navy in the U.S. District Court for the District of Columbia, asserting defamation claims against Boone and Westfall and employment discrimination claims against the Navy. ECF 1. The District Court for the District of Columbia found that venue was proper in the District of Maryland and transferred the case. ECF 11.

The United States moved on behalf of Boone and Westfall to substitute the United States as the defendant for Alessa's defamation claims based on certification under the Westfall Act, 28 U.S.C. § 2679(d)(1), that Boone and Westfall were acting within the scope of their employment at the time of the alleged defamatory statements. ECF 94; *see* ECF 6-1 (certification). The Court granted the motion without prejudice to Alessa's ability to challenge the scope of employment

certification. ECF 110, ¶ 1. The United States was substituted as the defendant in place of Boone and Westfall. *Id.* The Court ordered limited discovery on the scope of employment issue. ECF 49.

Alessa has moved to challenge Westfall Act certification for Boone and Westfall. ECF 135. The government opposed the motion, ECF 139, and Alessa replied, ECF 142. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023).

## II.    Standard of Review

"The Westfall Act immunizes federal employees from personal liability for claims that arise within the scope of their employment." *Doe v. Meron*, 929 F.3d 153, 160 (4th Cir. 2019). Under the Act, when a federal employee is sued,

> [u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). "Once this certification has been made, the United States is substituted as the sole defendant . . . [and] the plaintiff's sole route for recovery is the [Federal] Tort Claims Act." *Maron v. United States*, 126 F.3d 317, 321 (4th Cir. 1997). "[E]ven in cases where the United States has not waived its immunity, the United States must still be substituted and the individual defendant still remains immune from suit if the tort occurred within the scope of employment. The plaintiff, despite the seeming unfairness, cannot proceed against the individual defendants." *Id.* at 321–22.

"[T]he scope-of-employment certification is reviewable in court." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 420 (1995). Certification under the Westfall Act "satisfies the government's prima facie burden but does not carry any evidentiary weight unless it details and explains the bases for its conclusions." *Maron*, 126 F.3d at 323. A plaintiff can challenge Westfall

Act certification by "present[ing] persuasive evidence refuting the certification," which shifts the burden to the government to "provide evidence and analysis to support its conclusion that the torts occurred within the scope of employment." *Id.* To refute the certification, a plaintiff "must prove by a preponderance of the evidence that the defendant was acting outside the scope of his employment." *Meron*, 929 F.3d at 165; *see also Maron*, 126 F.3d at 323 ("We join with our sister circuits in placing the burden of proof on the plaintiff to refute the certification of scope of employment issued by the Attorney General and to prove by a preponderance of the evidence that the defendants were not acting within the scope of their employment."). The plaintiff, "at minimum, [must] present or forecast evidence that shows that the conduct of the officers and employees at issue did not involve the type of work they were employed to perform, occurred outside authorized space and time or was purely personal in nature." *Meron*, 929 F.3d at 165. Plaintiffs can rely on pleadings as well as supporting documentary evidence, including affidavits. *Id.* They "cannot rely on conclusory allegations and speculation." *Id.*

"At all stages of the process, it is for the district court to weigh the sufficiency of the evidence, to determine whether genuine issues of fact exist, and ultimately to resolve these factual issues." *Borneman v. United States*, 213 F.3d 819, 827 (4th Cir. 2000). "Once any factual issues are resolved, the district court must then proceed to 'weigh the evidence on each side to determine whether the certification should stand.'" *Id.* (quoting *Gutierrez de Martinez v. Drug Enf't Admin.*, 111 F.3d 1148, 1155 (4th Cir. 1997)).

## III.    Discussion

### A.  Scope of Employment

"[T]he question of whether [a person] was acting within the scope of his employment when he committed the alleged tortious acts" is "governed by the law of the state in which the alleged

tort occurred." *U.S. Tobacco Coop. v. Big S. Wholesale of Va., LLC*, 899 F.3d 236, 249 (4th Cir. 2018). Unless otherwise noted, the alleged tortious conduct here occurred in Maryland. Both parties agree that Maryland law governs the scope of employment inquiry.

In Maryland, the "test . . . for determining if an employee's tortious acts were within the scope of his employment is whether they were in furtherance of the employer's business and were 'authorized' by the employer." *Sawyer v. Humphries*, 587 A.2d 467, 470 (Md. 1991) ("*Sawyer* test"). The Maryland Supreme Court has cautioned that "[i]n applying this test, there are few, if any, absolutes." *Id.* at 471. But Maryland courts look to principles of agency law. *Id.* Some of the "pertinent" considerations for the *Sawyer* test include whether "the conduct [is] of the kind the servant is employed to perform," if it "occur[s] during a period not unreasonably disconnected from the authorized period of employment in a locality not unreasonably distant from the authorized area" and if it was "actuated at least in part by a purpose to serve the master." *Id.* (quoting *E. Coast Freight Lines v. Mayor & City Council of Baltimore*, 58 A.2d 290, 304 (Md. 1948) (citing Restatement of Agency, § 228 cmt. b)).

Under the first prong of the *Sawyer* test, the Maryland Supreme Court has considered whether an employee's conduct was "at least partially motivated by a purpose to serve [the employer]" or if instead the employee "[was] 'acting to protect [their] own interests.'" *See Balt. City Police Dep't v. Potts*, 227 A.3d 186, 211 (Md. 2020) (third alteration in original) (citation omitted) (quoting *Sawyer*, 587 A.2d at 470–71). Particularly in the case of intentional torts, an act is outside the scope of employment where "an employee's actions are personal, or where they represent a departure from the purpose of furthering the employer's business, or where the employee is acting to protect his own interests, even if during normal duty hours and at an authorized locality[.]" *Sawyer*, 587 A.2d at 471. "'[W]here the conduct of the servant is

unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment." *Id.* (quoting *Prosser and Keeton on The Law of Torts* § 70, at 506 (5th ed. 1984)). Not all intentional torts are outside the scope of employment, however: "An employer 'may be held liable for the intentional torts of [an employee] where the [employee]'s actions are within the scope and in furtherance of the [employer]'s business and the harm complained of was foreseeable.'" *Potts*, 227 A.3d at 199 (alterations in original) (quoting *Cox v. Prince George's County*, 460 A.2d 1038, 1043 (Md. 1983)).

Under the second prong of the *Sawyer* test, "certain conduct of the servant may be within the scope of his employment, although not intended or consciously authorized by the master," if it is "'of the same general nature as that authorized, or incidental to the conduct authorized.'" *See Sawyer*, 587 A.2d at 471 (quoting *Greater Atl. & Pac. Co. v. Noppenberger*, 189 A. 434, 440 (Md. 1937) (quoting Restatement of Agency § 229)). To determine whether the conduct is "so similar to or incidental to the conduct authorized as to be within the scope of employment," the Maryland Supreme Court has cited with approval the following factors from the Restatement of Agency:

> (a) [W]hether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (c) the previous relations between the master and the servant; (d) the extent to which the business of the master is apportioned between different servants; (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant; (f) whether or not the master has reason to expect that such an act will be done; (g) the similarity in quality of the act done to the act authorized; (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant; (i) the extent of departure from the normal method of accomplishing an authorized result, and (j) whether or not the act is seriously criminal.

*Noppenberger*, 189 A. at 440 (quoting Restatement of Agency § 229); *see also Sawyer*, 587 A.2d at 471. Courts also consider "whether the employee's conduct was 'expectable' or 'foreseeable.'" *Sawyer*, 587 A.2d at 256 (quoting *Cox*, 460 A.2d at 1042).

The Maryland Supreme Court provided additional clarity on the *Sawyer* test in *Baltimore City Police Department v. Potts*, 227 A.3d 186. In *Potts*, the court held that police officers who made stops and arrests without reasonable suspicion or probable cause, fabricated evidence, beat someone they arrested, made false statements in police reports, and lied under oath at trial acted within the scope of their employment—even though the police department "expressly forbade" the police officers' misconduct. 227 A.3d at 192. The *Potts* Court applied the *Sawyer* test and determined that "the officers' actions were 'incident[al] to the performance of the duties' that the Department entrusted to them, and that those actions did not render the officers' overall conduct outside the scope of employment." *See id.* (alteration in original) (quoting *Sawyer*, 587 A.2d at 470); *id.* at 214–15. The *Potts* Court found that the officers "were engaging in a police activity" when the misconduct occurred, that they "were at least partially motivated by a purpose to serve the Department," and "there [wa]s no indication that the officers were 'acting to protect [their] own interests[.]'" *Id.* at 211 (second and third alteration in original) (quoting *Sawyer*, 587 A.2d at 470–71). The actions were within the police officers' scope of employment notwithstanding their "wrongfulness":

> The issue that is before us, though, is not whether the officers' conduct was wrongful; it clearly was. Instead, the issue is whether the City and the Department are responsible for the officers' actions because their actions were within the scope of employment. We determine that the officers' actions were within the scope of employment[.]

*Id.* at 210.

The Maryland Supreme Court had reached a different conclusion in *Sawyer*. There, an off-duty police officer allegedly attacked someone and threw rocks at his car. 587 A.2d at 468. This conduct "had nothing to do with the defendant's duties as a police officer," where the police officer was not on duty and was driving his personal car and where

> there [wa]s no suggestion in the complaint that [the off-duty officer] was attempting to question, stop, detain or arrest the plaintiffs in connection with any traffic or criminal offense or any other matter of concern to the police department. . . . [I]nsofar as it appears from the complaint, [the officer] was acting for purely personal reasons and not incidental to any State law enforcement purpose.

*Id.* at 472 (footnote omitted).

The *Sawyer* test has also been applied to an employee's defamatory statements. *See Ennis v. Crenca*, 587 A.2d 485, 490–91 (Md. 1991) (city council member's allegedly defamatory statements to the press were outside the scope of her employment where the statements "appear[ed] to have been a political act undertaken for her own benefit"); *Larsen v. Chinwuba*, 832 A.2d 193, 199 (Md. 2003) (insurance commissioner's allegedly defamatory statements to the press about an investigation were made within the scope of his employment); *Embrey v. Holly*, 442 A.2d 966, 973 (Md. 1982) (corporate employer could be held liable for a local radio show host's defamatory remarks).

**B.  Alessa's Challenge to Westfall Act Certification**

Alessa challenges Westfall Act certification for three categories of allegedly defamatory statements pled in her complaint: (1) statements about her termination and qualifications, (2) statements accusing her of "travel fraud," and (3) statements that she had an extramarital affair.

**1.  Statements About Alessa's Termination and Qualifications**

Alessa challenges Westfall Act certification for her allegations that Westfall made defamatory statements about her termination and qualifications to members of the intelligence community. She has alleged that Westfall said Alessa had been fired from the Navy for cause, that her security clearance had been revoked, that she exaggerated her credentials, and that she was an insider threat. ECF 114, ¶¶ 139, 142, 145, 151, 156, 291–92. Alessa offers evidence that during a June 2019 NMIO meeting and a November 2019 conference, Westfall made statements to

members of the national security and intelligence community that Alessa was a poor performer, that she had exaggerated her credentials, that she had her security clearance access to classified information revoked, and that she was mentally unstable, an insider threat, and a national security risk. ECF 135-12, ¶¶ 16–17; 135-11, ¶¶ 10–11. And Alessa points to evidence that Westfall knew such statements, if made, would be false. ECF 135-8, at 26–27 (E. Westfall Dep. 93:10–94:19). For his part, Westfall has denied making these statements. *Id.* (E. Westfall Dep. 91:17–19, 92:14–93:9, 101:18–102:8); ECF 135-9, at 5–6 (E. Westfall Resp. to 1st Interrog.). The Court finds that Alessa has provided some evidence that Westfall made false statements about her termination and qualifications. Even so, if Westfall made these statements, he made them within the scope of his employment with the Navy.[1]

Start with the first *Sawyer* prong—whether the allegedly defamatory statements were made in furtherance of the Navy's business. They were. When Westfall made these allegedly defamatory statements about Alessa's recent departure from NMIO, he was speaking to other members of the intelligence community at a NMIO meeting and at a conference with other officials involved in "joint maritime national security operations." ECF 135-12, ¶¶ 11–12, 16. As Alessa acknowledges, Westfall attended these meetings "on behalf of the Navy." ECF 142, at 6. Westfall confirmed that, after Alessa left NMIO, he talked to others about her performance as a NMIO employee, noting that he "ha[d] reason to talk to folks about [BDAADS] and by extension Dr. Alessa" after the Navy

---

[1] Alessa offers evidence that Westfall made some of these statements at a conference in Australia. The Fourth Circuit has held that District of Columbia law applies when the conduct at issue occurs in a foreign country. *Meron*, 929 F.3d at 164. For scope of employment, "the pertinent law of the District of Columbia and Maryland are materially the same." *Id.*; *see also id.* ("[E]ven if Maryland law were applied, the result would not change."); *Blair v. District of Columbia*, 190 A.3d 212, 226 (D.C. 2018) (for tortious conduct to be within the scope of employment, it must be "foreseeable to the employer, meaning that it is a 'direct outgrowth of the employee's instructions or job assignments,'" but "the conduct need only be in part to serve the employer's interests" (quoting *District of Columbia v. Bamidele*, 103 A.3d 516, 525 (D.C. 2014)).

ended the BDAADS program. ECF 135-8, at 25 (E. Westfall Dep. 88:13–20); *see also id.* at 26 (E. Westfall Dep. 90:21–91:4). Westfall also confirmed that, at the November 2019 conference, he told other attendees about the BDAADS program coming to an end. *See* 135-8, at 28 (E. Westfall Dep. 100:15–101:17). Westfall made these statements about Alessa's work performance to colleagues in the national security and intelligence fields at work meetings that he attended as a Navy employee. Clearly, Westfall was "engaging in [Navy] activity" and was "at least partially motivated by a purpose to serve" the Navy when he made these allegedly defamatory statements about a former colleague to current colleagues. *See Potts*, 227 A.2d at 192, 211. Westfall's statements, even if defamatory, were made in furtherance of the Navy's business.

Alessa's arguments to the contrary are unpersuasive.

First, Alessa argues that "no interest of the Navy's could be advanced by identifying knowingly false security threats or claiming false national security concerns." ECF 135, at 10. This argument essentially is that because Westfall's statements were false and defamatory, they could not have been made in furtherance of the Navy's business. By Alessa's logic, a defamatory statement is never made in furtherance of the employer's business and thus an employer could never be liable for its employees' defamatory statements. Unfortunately for Alessa, that is not the law. As the Maryland Supreme Court has explained, "in all tort cases presenting the issue of whether an employee's acts were within the scope of employment, the acts are going to be wrongful." *Larsen*, 832 A.2d at 202. Conduct may be in furtherance of the employer's business even if it is wrongful. *See Potts*, 227 A.2d at 210 (finding "egregious" police officer misconduct that "no citizen should ever be subjected to" was in furtherance of the police department's business).

12

Alessa compares Westfall's statements to an employee's defamatory statements in *Lewis v. Forest Pharmaceuticals, Inc.*, 217 F. Supp. 2d 638 (D. Md. 2002). In *Lewis*, a supervisor issued an allegedly defamatory performance evaluation of Lewis after Lewis rejected the supervisor's sexual advances and told him that she would file a sexual harassment complaint. 217 F. Supp. at 642–43, 657–58. The court ultimately determined that the employer could be liable for the supervisor's defamatory statements under Maryland law because the employer "later ratified what they had done" by refusing to withdraw the evaluation even after finding the supervisor's behavior "inappropriate" and "unprofessional." *Id.* at 660. However the court commented that if the supervisor "wrote and published the [performance evaluation], knowing it was false, because Ms. Lewis had rejected his sexual advances and/or because she had told him that she was going to file a complaint against him, he may have acted outside the scope of his employment" because "[s]uch motives appear 'unrelated and even antithetical to the objectives of the employer.'" *Id.* at 659 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 757 (1998)). The *Lewis* Court also noted that the supervisor may have acted outside the scope of their employment even without this "discriminatory or retaliatory super-motive" because "[i]ntentionally issuing a false performance evaluation cannot, it would seem, further [the employer's] business interests" given that "[a]n employer relies on performance evaluations to identify both superior and inferior employees." *Id.* at 659–60.

*Lewis* is not on point here. The *Lewis* Court ultimately held that the employer could be liable for the employee's statements because the employer subsequently ratified—and therefore "retroactively authorized"—the employee's conduct. *Id.* at 660–61. The opinion's language that Alessa leans on—that the supervisor "may" have acted outside the scope of employment—was not part of its holding. And the supervisor in *Lewis* had a personal motive to make the defamatory

statement that was unrelated to furthering the employer's objectives. As explained below, Alessa has not shown that Westfall had a similar personal motive. Also, there is nothing analogous to the *Lewis* Court's finding that a false performance evaluation "cannot . . . further [the employer's] business interests" because the employer cannot "rel[y]" on such evaluations "to identify both superior and inferior employees." *See id.* at 659–60. Westfall's statements, even if false, did not cause the Navy to rely on inaccurate statements that conflict with its interests.

Next, Alessa argues Westfall made the allegedly defamatory statements for his own personal benefit. Again, her argument fails. Alessa attempts to prove Westfall had a personal motive to make the defamatory statements by pointing to inconsistencies between his deposition testimony and answers to interrogatories. *Compare* ECF 135-8, at 12, 14–15, 25–26, 28, 52 (E. Westfall Dep. 34:1–35:10, 45:2–46:21, 88:13–20, 89:19–90:3, 90:21–91:16, 101:11–17, 197:13–17) (admitting to having conversations about Alessa and her job performance), *with* ECF 135-9, at 2–5 (E. Westfall Resp. to 1st Interrog.) (failing to include conversations about Alessa and her job performance in response to interrogatory asking about communications concerning her employment suitability). Even if the Court agreed that Westfall's deposition testimony was inconsistent with his answers to interrogatories, the inconsistencies do not suggest, let alone demonstrate, that his own personal interests motivated him to make the allegedly defamatory statements.

Undoubtedly, defamatory statements can be made outside the scope of employment when they are made for the employee's own personal gain. In *Ennis v. Crenca*, 587 A.2d 485, the Maryland Supreme Court considered whether allegedly defamatory statements made by a Montgomery County council member to the press were in the scope of the council member's employment. Council member Crenca gave a news interview accusing Ennis, president of a local

citizens' group, of offering Crenca a bribe. *Id.* at 486–87. Ennis sued Crenca for defamation. *Id.* at 487. Crenca moved to dismiss the complaint, arguing that Maryland's Local Government Tort Claims Act required dismissal because Crenca was acting in the scope of her employment when she gave the interview. *Id.* at 487–88. The Maryland Supreme Court found Crenca was not acting in the scope of her employment. Applying the first prong of the *Sawyer* test, the *Ennis* Court determined that "[i]t [wa]s difficult to understand how Ms. Crenca could have been fulfilling her duties as a local legislator, or in any way furthering Montgomery County's business, by publicly accusing Ms. Ennis of offering her money to pay campaign debts in order to influence her vote on a controversial development proposal," where "the defamatory conduct took place 76 days after the alleged bribe and long after the council's vote." *Id.* at 490. "It [wa]s more reasonable to infer from the facts alleged that Ms. Crenca's public statements were made to discredit Ms. Ennis and other political opponents in order to protect Ms. Crenca's career as an elected official." *Id.* Thus, Crenca's conduct "appear[ed] to have been a political act undertaken for her own benefit." *Id.* Crenca's defamatory statements were not made in furtherance of her employer's business. *Id.*

*Crenca* finds no comparison here. Westfall's statements are not in the same vein. Unlike Crenca, there is no indication that Westfall spoke about Alessa's termination or qualifications for his own personal benefit. Crenca made public statements about a political opponent in order to protect her own political career. Westfall made statements to other members of the national security and intelligence community about a former colleague. Alessa has not brought forth evidence to show that he had a personal motive to tell his colleagues that she had been fired for cause, had her security clearance revoked, or disparage her performance and qualifications. Alessa

has not shown that Westfall's statements about her were made "in order to protect [Westfall's] career," *id.*, or for any other reason that would personally benefit him.[2]

Alessa has not shown that Westfall was not acting in furtherance of the Navy's interests when he made statements about her termination and qualifications at the June 2019 NMIO meeting and November 2019 conference.

Now turn to the second *Sawyer* prong. Alessa must show that Westfall's statements were not "authorized" by the Navy. She has not made this showing.

The Fourth Circuit has "emphasized the importance of looking at the allegedly tortious act in context" when considering whether conduct is "authorized" by an employer:

> Few government authorities are authorized to commit torts as part of their line of duty, but to separate the activity that constitutes the wrong from its surrounding context—an otherwise proper exercise of authority—would effectively emasculate the immunity defense. Once the wrongful acts are excluded from an exercise of authority, only innocuous activity remains to which immunity would be available. Thus the defense would apply only to conduct for which its not needed.

*Maron*, 126 F.3d at 325 (quoting *Johnson v. Carter*, 983 F.2d 1316, 1323 (4th Cir. 1991) (en banc), *overruled in part on other grounds by Lamagno*, 515 U.S. 417).

In *Potts*, the Maryland Supreme Court held that the police officers' "egregious" misconduct was authorized by police department even though the department "expressly forbade" their actions. 227 A.3d at 192, 210. The Court looked to the ten factors set out in *Sawyer* from the Restatement of Agency to determine whether the officer's actions "w[ere] incidental to actions authorized by the Department." *Id.* at 214. Notably, in going through the factors, the *Potts* Court

---

[2] Alessa also asserts that Westfall "claims to have been promoting Dr. Alessa and her program, but also admits that he never spoke with her after she left NMIO." ECF 135, at 9 (citation omitted). But Westfall's lack of communication with Alessa after she left NMIO does not suggest, without more, that his communications with others about Alessa or BDAADS—whether promotional or defamatory in nature—were motivated by his own personal interests.

largely did not focus on the wrongful nature of the conduct, such as the lack of probable cause for the officers' arrests or their fabrication of evidence. Instead, the court primarily looked at the tasks the police officers performed when they undertook these actions. For example, although the officers were making unlawful arrests, the court noted that "[t]he officers' actions appear to consist of police activities during which the officers engaged in misconduct for the purpose of giving the appearance of making lawful arrests on behalf of the Department," their conduct "occurred while they were on-duty officers of the Department," "the purpose of the officers' misconduct appeared to be to further the Department's routine business of making arrests," and "[m]ost of the officers' misconduct consisted of taking authorized actions in unauthorized ways." *Id.* at 215–17. Ultimately, the factors "weigh[ed] in favor of determining that the officers' misconduct is to be considered authorized," particularly because "there was no indication that they were acting for their own personal benefit." *Id.* at 218.

Here, Westfall's allegedly false statements were authorized by the Navy—or at least "incidental to the conduct authorized." *See Sawyer*, 587 A.2d at 471 (quoting *Noppenberger*, 189 at 440). Westfall made the statements when he attended a NMIO meeting and a conference on behalf of the Navy. Westfall was speaking to his colleagues in the national security and intelligence community about the Navy's BDAADS program and its demise, and during those conversations, he spoke about Alessa's work performance and the reasons she left the Navy. Attending a work meeting and a professional conference on behalf of the Navy was part of Westfall's duties as a Navy employee. And when he spoke with colleagues at those meetings about an important Navy program and about Alessa, a former Navy employee who had worked on the program, Westfall was discussing Navy business during either Navy-sponsored or Navy-attended meetings with other Navy, national security, and intelligence colleagues. As a NMIO employee, Westfall "ha[d] reason

to talk to folks about the program and by extension Dr. Alessa" after the Navy ended the BDAADS program. ECF 135-8, at 25 (E. Westfall Dep. 88:13–20). These conversations were foreseeable. Even if Westfall's statements during the meetings with his professional colleagues were defamatory, they were incidental to conduct authorized by the Navy.

*Larsen v. Chinwuba*, 832 A.2d 193, illustrates when an allegedly defamatory statement has been authorized by an employer. There, the Maryland insurance commissioner made statements to the press about a health maintenance organization ("HMO") during an investigation into the HMO's finances. 832 A.2d at 196. The primary owner of the HMO sued the commissioner for defamation. *Id.* The commissioner was immune from suit under the Maryland Tort Claims Act if his conduct was "'within the scope of the public duties of the State personnel,'" a phrase the Maryland Supreme Court deemed "coextensive with the common law concept of 'scope of employment.'" *Id.* at 200 (first quoting Md. Code Ann., Cts. & Jud. Proc. § 5-522(b); and then quoting *Sawyer*, 587 A.2d at 470). Applying *Sawyer*, the Maryland Supreme Court held that the commissioner's allegedly defamatory statements "were made in the course of his public duties." *Id.* at 199. As "the head of a major agency in the executive branch," the insurance commissioner "[was] authorized to disclose to the public matters concerning the agency's operations." *Id.* at 201. Because the "disclosures were made during the regular course of business and related entirely to the operations of the Insurance Administration," the *Larsen* Court deemed the disclosures "incidental to the business of managing the Insurance Administration." *Id.* The Maryland Supreme Court rejected the lower court's reasoning that, because the commissioner's disclosure allegedly violated a provision of the insurance code, the commissioner acted wrongfully and therefore outside the scope of his employment. *Id.* at 202. Wrongful acts, the Maryland Supreme Court explained, can still be within the scope of employment. *See id.* "Very seldom will an employer

specifically authorize an employee to violate a statute, and such authorization is not required for scope of employment purposes." *Id.* Because Larsen's disclosures "were incident to the performance of his duties as Insurance Commissioner," he did not act outside of the scope of his employment. *Id.*

As in *Larsen*, Westfall's allegedly defamatory statements were "incidental to the business" of the Navy, made in the "performance of his duties" as a Navy employee, and made "during the regular course of [Navy] business" and "related entirely to the operations of the" Navy. *Id.* The falsity of Westfall's statements does not change the Court's analysis. Larsen's statements were also allegedly false and they even purportedly violated the state's insurance code. Yet the *Larsen* Court still found that this "wrongful" conduct was still "incidental" to his duties as the insurance commissioner. *Id.* at 201–02. As in *Larsen*, Westfall's allegedly defamatory statements were incidental to his authorized duties as a Navy employee.

Alessa has not shown that Westfall's statements at the June 2019 NMIO meeting and November 2019 conference were not authorized by the Navy.

Westfall denies making the allegedly defamatory statements about Alessa's termination and qualifications. Alessa has submitted evidence that Westfall made such statements.[3] But the

---

[3] Alessa offers evidence from Westfall's deposition that Westfall made statements at unspecified times about Alessa, her performance, and the BDAADS program, including statements to individuals mentioned in Alessa's complaint, such as Mike Potts at U.S. Coast Guard Intelligence and Nicole Wells and Michael Shimoff in the Office of the Director of National Intelligence. *See* ECF 135-8, at 12, 14–15, 23, 25–26, 53 (E. Westfall Dep. 34:1–35:16, 45:2–46:21, 78:10–80:18, 87:2–88:20, 89:19–91:16). The record is not clear as to whether these discussions occurred during the June 2019 NMIO meeting or the November 2019 conference, but there is no evidence that the discussions Westfall mentions in his deposition involved Westfall making statements about Alessa being fired for cause, losing her security clearance, or the other allegedly defamatory statements about Alessa's termination and qualifications. Even if there was, the evidence Alessa cites to confirms Westfall acted within the scope of his employment during these discussions. Westfall describes speaking about Alessa and her program to update interested parties about BDAADS and to try to find a new home for the program, which he believed advanced the United States' national

Court need not resolve this issue, because even if Westfall did make these statements, Alessa has not shown by a preponderance of the evidence that Westfall was acting outside of the scope of his employment.[4]

### 2. Statements Accusing Alessa of "Travel Fraud"

In her amended complaint, Alessa alleges that Boone "reported potential crimes, which have all been investigated and disproven, to, among others, the Department of Homeland Security and the U.S. Attorney's Office." ECF 114, at ¶ 158. Alessa claims that Boone was acting outside the scope of his employment when he accused her of committing "travel fraud" in a sworn declaration prepared for the investigation into Alessa's EEO complaint, and she challenges Westfall Act certification for this conduct.

In a declaration that Boone prepared for the Navy's EEO investigation, Boone raised several concerns about Alessa's travel.[5] First, Boone asserted that Alessa improperly requested

---

security efforts. *See, e.g.*, *id.* at 25, 54 (E. Westfall Dep. 88:13–20, 205:3–10). Such statements are in furtherance of the Navy's business. And Westfall's discussions were at least incidental to what he, a Navy official, was authorized to do—speak to other military and intelligence officials about a former colleague and a former NMIO program. Alessa has not shown that Westfall's statements about her during these discussions were made outside the scope of his employment with the Navy.

[4] Alessa asserts in her motion to challenge Westfall Act certification that, at the June 2019 NMIO meeting, Boone made the same false statements about Alessa's termination. *See* ECF 135, at 9–10 (citing ECF 135-12, at 3). However, Alessa does not allege in her amended complaint that Boone made these statements. *See* ECF 114. Even if she had, the Court would reach the same conclusion that it has for Westfall's statements. Alessa acknowledges that Boone attended the meeting "on behalf of the Navy." ECF 142, at 6. She makes the same unconvincing arguments she made for Westfall's statements. *See* ECF 135, at 9–10. Just as Westfall's statements were made within the scope of his employment, Boone's were too. Boone was acting within the scope of his employment when he, as a NMIO employee, discussed the termination and qualifications of another NMIO employee at a NMIO meeting.

[5] Alessa cites to Boone's entire EEO declaration, ECF 135-5, as evidence that he accused her of travel fraud, without providing any guidance as to which sections of the 56-page declaration she is referencing. The Court has identified what appear to be the relevant portions of the declaration.

travel approval after Price suspended work on BDAADS. *See* ECF 135-5, at 34, 36–39; ECF 136, at 13–14 (T. Boone Dep. 41:2–47:15). Second, Boone suggested that Alessa misappropriated Navy funds by staying at the home of Moon—a DHS employee—while asking the Navy to pay for her NMIO travel. *See* ECF 135-5, at 57; ECF 136, at 39–41 (T. Boone Dep. 145:2–150:13, 153:11–16). Boone suggested that Alessa's actions potentially violated the Antideficiency Act (a law concerning the misappropriation of government funds). *See* ECF 135-5, at 9. *See generally* ECF 136, at 13 (T. Boone Dep. 41:5–11) (describing the Antideficiency Act). Boone made these statements within the scope of his employment with the Navy.

Under *Sawyer*, Boone's accusations were made in furtherance of the Navy's business and were authorized by the Navy. Boone prepared the declaration as part of the Navy's investigation of Alessa's EEO complaint. *See* ECF 135-5 at 2; ECF 136, at 18 (T. Boone Dep. 58:20–59:11). In his declaration, Boone responds to specific questions about Alessa's time at NMIO, including questions about her travel requests. *See* ECF 135-5, at 35–39. He provides more information about his concerns in an open-ended question asking if he has additional information relevant to the investigation, *see id.* at 57, which, as Boone explains, he provided in light of the aforementioned questions about Alessa's travel, ECF 136, at 41 (T. Boone Dep. 150:2–13). In response to these questions, Boone expressed concerns about the travel requests that Alessa submitted after the BDAADS stop-work order, her request that the Navy fund her work travel while she stayed at a DHS employee's house, and the implications of this alleged misuse of funds under the Antideficiency Act. Reporting concerns about travel improprieties and misuse of the Navy's funds is clearly "in furtherance of the [Navy's] business." *See Sawyer*, 587 A.2d at 470. And his declaration was undoubtedly "authorized" by the Navy because the Navy asked him to submit the declaration as part of its investigation of Alessa's employment discrimination claims. *See id.* The

reason Boone filled out the declaration was because of his employment with the Navy and his professional relationship with Alessa. Boone's accusations regarding Alessa's alleged travel fraud were made within the scope of his employment.

Once again, Alessa argues the statements were not made within the scope of employment because they were false. The evidence she cites does not establish falsity. *See* ECF 135, at 8–9 (citing ECF 135-1 *and* ECF 135-6, at 8–13).[6] Even if it did, false statements, as discussed above, may be made within the scope of employment. Falsity alone is not enough to show that Boone acted outside the scope of his employment.

Next, Alessa argues that Boone was acting in his personal interest rather than the interest of the Navy when he made these accusations about her misuse of Navy funds for travel. Alessa's support for this argument is flimsy. She claims the timing of Boone's accusations suggests he made them to retaliate against Alessa for filing an EEO complaint accusing Boone of discrimination. If, Alessa argues, Boone really suspected she had committed travel fraud, he would have reported the suspected misconduct earlier through the proper channels. But Boone said in his declaration that he had voiced concerns about Alessa's travel requests to his superiors before submitting his EEO declaration. *See* ECF 135-5, at 38. And even if Boone first made these accusations after Alessa filed her EEO complaint, the timing does not indicate Boone fabricated those concerns because he had personal animus towards Alessa. Boone expressed concerns about Alessa's travel requests for

---

[6] Alessa cites to the entirety of her responses to the government's first set of interrogatories, ECF 135-1, and a section of the DHS AHU investigation report summarizing interviews of Alessa and Moon and the facts found during the investigation, ECF 135-6, at 8–13, as evidence that Boone's allegations concerning her work-related travel were false. The Court could not identify in Alessa's first set of interrogatories evidence supporting Alessa's statement that Boone's allegations about her travel were false. As for the DHS AHU investigation report, the only relevant portion the Court identified was that Alessa and Moon told the DHS AHU that Alessa occasionally stayed at Moon's house or at an Airbnb near his house. This does not establish the falsity of Boone's statements in his EEO declaration.

NMIO-related work because she submitted them after the BDAADS stop-work order, which was issued the same day that Alessa filed the EEO complaint. He did not have cause for concern—and therefore could not express any—before the stop-work order issued. It is true Boone testified that he did not report Alessa staying with Moon before submitting his EEO declaration. *See* ECF 136, at 40–41 (T. Boone Dep. 147:18–150:13). This accusation is not tied to the timing of the stop-work order. But Boone made these accusations when he responded to an open-ended question asking for information relevant to the investigation of Alessa's EEO complaint. *See* ECF 135-5, at 57. This catch-all question followed several questions that prompted Boone to report concerns that Alessa had misused Navy funds for travel. Boone's statement that Alessa had stayed at Moon's house when she came to the Washington, D.C. area for work in response to the catch-all question does not suggest he acted out of personal animus. Even if Boone had not expressed this concern before, he was asked a question during an investigation that prompted him to report the issue, and he answered it. Alessa has not shown, by a preponderance of the evidence, that Boone made these statements in retaliation for Alessa's EEO complaint. "[U]nsubstantiated speculation about the ill will of h[er] colleagues . . . is not enough, in and of itself, to transform acts which are facially within the scope of employment into acts that fall outside of that scope." *Maron*, 126 F.3d at 327. The statements in Boone's declaration, including his accusations concerning Alessa's travel requests, were made within the scope of his employment.[7]

---

[7] Alessa raises an additional example of Boone accusing her of travel fraud: Boone's statements in an email from April 2023. *See* ECF 135, at 9 (citing ECF 135-7, at 2–3 (T. Boone email)). Boone's email, sent nearly three years after Alessa filed her lawsuit, informs Navy officials and Assistant U.S. Attorney Kelly Marzullo of Boone's renewed concern that Alessa was misusing Navy funds for travel. *See* ECF 135-7, at 2–3. This email does not form the basis of Alessa's defamation claim for which the United States was substituted as the proper defendant. The Court did not grant Alessa leave to amend her defamation claims. However, even if the email was at issue, Boone, a Navy employee, was reporting concerns about the misuse of Navy funds to federal officials. This email was sent within the scope of Boone's employment.

### 3.  Statements Accusing Alessa of Having an Extramarital Affair

Finally, Alessa challenges Westfall Act certification for allegedly defamatory statements that she had an extramarital affair with Moon. She argues these statements were not made within the scope of Boone or Westfall's employment. The statements fall into two categories: (a) an anonymous DHS complaint and (b) statements made by Boone and Westfall to senior Navy officials.

### a.  Anonymous DHS Complaint

Sometime before August 28, 2019, the DHS OIG received an anonymous complaint that Alessa and Moon were having an extramarital affair and that it negatively affected the work environment. ECF 135-6, at 2. The DHS AHU investigated the complaint. *See id.* at 2–15; ECF 135-3, at 2–3. The complaint is not part of the current record. According to Alessa, the complainant identified themselves as a DHS Policy employee and identified Moon as Alessa's supervisor. *See* ECF 135-1, at 5. Alessa says that the complaint described dates and locations that the alleged affair took place and stated that an individual was removed from their position as a result of the affair. *Id.* She also says the complaint described Moon as "aggressive" in defending Alessa when someone questioned her credentials. *Id.* According to a report on the DHS AHU investigation into the anonymous complaint, Alessa and Moon denied that they ever had a sexual relationship. ECF 135-6, at 6, 10. The investigation determined that Alessa and Moon traveled together for work, that they occasionally stayed in the same hotel or Airbnb (but in different rooms), and that Alessa occasionally stayed in the spare bedroom in Moon's home. ECF 135-6, at 9, 11; ECF 135-3, at 3. Witnesses interviewed by investigators did not provide evidence that Moon and Alessa's relationship negatively impacted the work environment. ECF 135-6, at 11. And the investigation did not reveal who made the anonymous complaint. *Id.*

Alessa alleges that that Boone made the anonymous complaint. ECF 114, ¶¶ 135–36, 275–76. The government asserts, and Boone has sworn, that he did not submit the complaint. *See* ECF 139, at 10 (citing ECF 136, at 15 (T. Boone Dep. 47:22–48:17)); *see also* ECF 135-10, at 5–6 (T. Boone Resp. to 1st Interrog.). In her motion to challenge Westfall Act certification, Alessa insists that Boone submitted the complaint even though he denies it.

A court reviewing Westfall Act certification is not required to accept a plaintiff's allegations as true. "The United States . . . must remain the federal defendant in the action unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Osborn v. Haley*, 549 U.S. 225, 231 (2007). Even if "a federal officer charged with misconduct asserts, and the Government determines, that the incident or episode in suit never occurred," Westfall Act certification nevertheless is proper. *Id.* at 247. Therefore, an employee who "denies wrongdoing" may still benefit from the Westfall Act's "shield," and the court reviewing the government's certification must resolve the factual dispute. *Id.* at 247–48.

In *Osborn v. Haley*, the Court considered a challenge to Westfall Act certification for Haley, a federal employee sued for tortiously interfering with Osborn's employment relationship and conspiring to bring about Osborn's wrongful discharge. *Id.* at 232–33. After the U.S. Attorney certified that Haley was acting in the scope of his employment, the United States was substituted as the defendant under the Westfall Act. *Id.* at 233–34. Osborn opposed the substitution. *Id.* at 234. The government denied the conduct at issue ever occurred. *Id.* at 235. The district court ultimately found the Westfall Act certification invalid because, taking the facts alleged in Osborn's complaint as true, Haley acted outside the scope of his employment, and the court concluded Westfall Act certification was improper if the government merely denied that the conduct had occurred at all.

*Id.* at 235–36. The Sixth Circuit reversed. *Id.* at 236. The case reached the Supreme Court, which settled a circuit split. The Court explained that "it would make scant sense to read the [Westfall] Act as leaving an employee charged with an intentional tort to fend for himself when he denies wrongdoing," and thus "Congress did not, and sensibly should not, command that innocent employees be left outside the Westfall Act's grant of suit immunity." *Id.* at 248 & n.12 (footnote omitted). Accordingly, a court faced with a Westfall Act certification challenge is not required to take the plaintiff's allegations as true and decide whether the conduct alleged, if it occurred, would be within the scope of employment. *Id.* at 249–50. Instead, when faced with a factual dispute over whether the alleged conduct occurred, the court must resolve that dispute, and the United States "must remain the federal defendant in the action unless and until the District Court determines that the employee, *in fact*, and not simply as alleged by the plaintiff, engaged in conduct beyond the scope of his employment." *Id.* at 231; *accord Borneman*, 213 F.3d at 827–28 (district court erred when ruling on Westfall Act certification challenge because it "took [the plaintiff's] allegations as true, rather than requiring him to 'present[ ] persuasive evidence' in support of the allegations and allowing [the federal employee] and the government to present contrary evidence, which would then be weighed by the court" and therefore "fail[ed] to hold [the plaintiff] to his burden of proof" (second alteration in original) (citation omitted) (quoting *Maron*, 126 F.3d at 323)). Certification must stand "unless and until the district court determines that the federal officer originally named as defendant was acting outside the scope of his employment." *Osborn*, 549 U.S. at 252. If the court determines that the conduct never occurred, it should not disturb Westfall Act certification. *See Maron*, 126 F.3d at 326 n.7 ("[I]t was entirely proper to preclude Maron from keeping the private defendants in the case by merely speculating that they had been responsible for hostile acts which would have been beyond their job descriptions had they been responsible.").

26

Even after discovery on the issue, Alessa offers little more than speculation that Boone submitted the anonymous complaint.[8]

First, Alessa argues that Boone must have authored the complaint because the complainant mentioned an employee's removal due to the alleged affair, and Boone was removed from his supervisory position at NMIO.[9] This theory has two significant flaws. First, there is no evidence that the complainant was referring to their own removal. The meager descriptions of the complaint in the record suggest that the complainant was referring to a third party who was removed. *See* ECF 135-1, at 5. Second, even if the complainant was referring to their own removal, there is no evidence that Boone was the only one removed from their position during the relevant time period. And even if Boone was removed from his supervisory position shortly before the complaint was

---

[8] Alessa submitted a document titled "Affidavit of Mr. Sean Kerry Moon," signed and dated by Moon September 19, 2023. ECF 135-2. To qualify as an affidavit or declaration in this Court, a document must state that its author swore or signed under penalty of perjury that is contents are true to the best of the author's knowledge, information, and belief. *See* Loc. R. 601.3; *see also* 28 U.S.C. § 1746. The document from Moon does not conform to these requirements. Even if it did, that would not alter the Court's analysis or conclusions. Moon's relevant statements—almost entirely duplicative of Alessa's interrogatory response describing the DHS complaint—do not provide a factual basis for finding that Boone submitted the anonymous complaint.

[9] Alessa also suggests that "the complaint's focus on the alleged affair" indicates that it was submitted by Boone. ECF 135, at 8. It is unclear how the focus on the affair connects the complaint to Boone specifically. To the extent that Boone had raised concerns about Alessa's relationship with Moon and its impact on the workplace, he was not the only one. Westfall's deposition and interrogatory responses indicate that multiple members of the BDAADS team had voiced concerns about Moon and Alessa's interactions in professional settings—including their physical contact in the workplace and Moon's sexually inappropriate comments—and that Moon and Alessa were provided training and counseling to address these concerns. *See* ECF 135-9, at 3–4; ECF 135-8, at 17 (E. Westfall Dep. at 55:19–56:20). Boone's EEO declaration, deposition, and interrogatory responses describe how Honey Elias, a former NMIO employee, expressed similar concerns. *See* ECF 135-5, at 57; 135-10, at 4; ECF 136, at 44–45 (T. Boone Dep. 165:10–166:17). Individuals other than Boone had either expressed or heard concerns about Alessa and Moon's interactions in the workplace. The subject matter of the complaint does not support the inference that Boone is the presumptive author.

submitted (which is unclear from the record), mere temporal proximity between Boone's removal from his position and the anonymous complaint is not enough to show that Boone submitted the complaint.[10]

Alessa's speculation that Boone submitted the complaint continues. She argues that the complaint's mention of "specific travel dates and data"—dates she does not identify but says coincide with her work trips to Washington, D.C. or travel with Moon—show that the complainant must be Boone because only Boone and a select few others knew the dates of her work-related travel. *See* ECF 135, at 8; ECF 135-1, at 5. Yet Alessa admits that three other people at NMIO knew she was traveling for work on the dates apparently mentioned in the complaint. *See* ECF 135-1, at 5. To zero in on Boone, Alessa contends that "[t]he other three individuals that had access to the travel information included in the DHS complaint all participated in Boone's removal, and thus would not have complained about it." *See* ECF 142, at 3 (citing ECF 135-1).[11] This inference is premised on yet another assumption that Alessa has not supported with evidence: that the DHS

---

[10] Alessa tries to bolster her argument by pointing to Boone's purported motivation to retaliate for his removal from a supervisory position on the BDAADS project. According to Alessa, Boone was so incensed about his removal that he posed as a DHS employee and filed a complaint that accused her and Moon of an inappropriate relationship. To be sure, having an axe to grind could have prompted someone to submit the complaint. And the record before the Court suggests that Alessa and Moon were at odds with Boone during her tenure at NMIO. *See, e.g.*, ECF 135-5, at 11–12, 16, 20; ECF 136, at 17 (T. Boone Dep. 55:19–56:7); ECF 135-10, at 3–4. But Boone's purported motive to retaliate against Alessa does not mean that Boone submitted the complaint.

[11] It is unclear how Alessa knows that only four individuals had access to the relevant dates mentioned in the anonymous complaint, which coincide with Alessa's travel to Washington, D.C., and her travel with Moon to various workshops and meetings. *See* ECF 135-1, at 5. Her support for these statements stems from her own responses to interrogatories and statements from Moon, and neither individual explains how they have first-hand knowledge of everyone with access to these dates. Further, Alessa alleges in her complaint that the Office of Naval Intelligence Travel Management Coordinator, Theresa Bearer, had previously ensured that her travel to Washington, D.C. in February 2019 got approved. ECF 114, ¶¶ 107, 109. Boone also testified in his deposition that Bearer "actually d[id] the final approval" of Alessa's travel. *See* ECF 136, at 49 (T. Boone Dep. 184:4–7).

complainant's description of "someone['s]" removal refers to Boone's removal. These many layers of conjecture do not provide factual support for Alessa's allegations. Boone's apparent knowledge of the significance of the dates referenced in the DHS complaint does not show that he submitted the complaint.

Grasping at straws, Alessa argues that Boone must be the author of the complaint because the complainant "[used] terminology and [made] mistakes regarding the office organization and supervisory chains with DHS that were idiosyncratic to Mr. Boone." ECF 135, at 8. The "terminology" and "mistakes" are apparently the reference to Moon as Alessa's supervisor. *See id.* Alessa had not worked in Moon's chain of command at DHS since 2017. *See, e.g.*, ECF 135-3, at 2. This error, Alessa says, is "idiosyncratic" to Boone, who has erroneously described Moon as Alessa's supervisor even after she no longer worked in Moon's chain of command. *See id.* (citing ECF 135-5, at 57 (Boone describing "Dr. Alessa living at her DHS supervisor's house (Mr. Sean Moon)") *and* ECF 136, at 41 (T. Boone Dep. 153:17–20) (Boone affirming that Moon acted as Alessa's supervisor at DHS)). But Boone is not the only one who could have made this mistake. Paperwork indicated Moon was her supervisor at one point. An old DHS IPA agreement listed Moon as Alessa's supervisor at DHS, and she was within Moon's chain of command at DHS for approximately four months in 2017. *See* ECF 84-7, at 3 (IPA agreement with "period of assignment" from June 5, 2017 to June 5, 2019 identifying Alessa's "[i]mmediate supervisor" at DHS as "Sean Moon, Chief, Global Strategies"); *see also* ECF 135-6, at 11 (finding by the DHS AHU that "Dr. Alessa worked in Moon's chain-of-command for about 4 months in 2017"). Given that Moon was listed as Alessa's supervisor under this prior formal arrangement with DHS, and further given that she was briefly within Moon's chain of command, the Court cannot conclude that only Boone could have incorrectly called Moon Alessa's supervisor.

In sum, Alessa has not offered factual support for her contention that Boone posed as a DHS employee to lodge a complaint about Alessa and Moon's relationship and its impact on the work environment. She asks the Court to draw the "logical inference" that Boone submitted the DHS complaint, ECF 142, at 3, but the Court cannot draw blood from a stone. Boone has sworn he did not submit the DHS complaint. Alessa has not offered sufficient evidence to rebut his testimony.

Even if filing the anonymous DHS complaint would be considered outside the scope of Boone's employment—a question the Court need not reach—the record does not show, "*in fact*," that Boone engaged in this conduct. *See Osborne*, 549 U.S. at 231. The Court finds that Boone did not submit the anonymous complaint. Thus, the Court denies Alessa's Westfall Act certification as to the allegations of Boone's purported DHS complaint.

### b.  Statements to Senior Navy Officials

In her amended complaint, Alessa also alleges that Boone and Westfall "communicated their belief that [she] was having an extra-marital affair to senior Navy officials." ECF 114, ¶ 137; *see also id.* ¶¶ 276, 289.[12] Alessa says these statements contributed to the Navy's decision to terminate her employment. *Id.* ¶ 137. Both Boone and Westfall have denied making such statements in either sworn testimony or interrogatory responses submitted under penalty of perjury.

---

[12] Alessa alleges that Westfall told "senior Navy officials and/or the [DHS] Inspector General that Dr. Alessa and her colleague Mr. Moon were engaged in an extra-marital affair." ECF 114, ¶ 289; *see also id.* ¶ 288. Westfall denies ever alleging that Alessa and Moon had an extramarital affair or filing the DHS complaint. ECF 135-8, at 17, 48 (E. Westfall Dep. 54:20–55:3, 180:16–18). In her motion to challenge Westfall Act certification, Alessa does not even speculate—let alone offer evidence—that Westfall told the DHS OIG that Alessa was having an extramarital affair. Her motion makes clear that she believes "only Boone" could have submitted the anonymous complaint to the DHS OIG. *See* ECF 142, at 3.

ECF 135-10, at 5–6 (T. Boone Resp. to 1st Interrog.); ECF 135-8, at 17 (E. Westfall Dep. 54:20–55:3); ECF 135-9, at 5–6 (E. Westfall Resp. to 1st Interrog.).

Alessa has not submitted *any* evidence to support her allegation that Boone and Westfall made such statements. The only evidence she cites in her motion to challenge Westfall Act certification is evidence that she did not, in fact, have an extramarital affair with Moon. *See* ECF 135-1, at 3; ECF 135-3, at 2–3. But evidence that Alessa did not have an extramarital affair does not show that Westfall or Boone told senior Navy officials that she did. There is evidence in the record that NMIO employees complained about her and Moon's interactions in the workplace. *See, e.g.*, ECF 135-8, at 17 (E. Westfall Dep. 55:19–56:20); ECF 135-9, at 3 (explaining that NMIO staff notified Westfall that "about an incident that several people perceived to be inappropriate personal conduct between Dr. Alessa and Sean Moon"); ECF 136, at 45 (T. Boone Dep. 166:8–17) (describing Honey Elias's complaints about Alessa and Moon "touching each other in the workplace" and that Elias "felt uncomfortable being on the team with both the verbal and the physical contact"). But this evidence also does not show that Westfall or Boone told senior Navy officials that Alessa and Moon were having an extramarital affair. Alessa has not proven that Boone and Westfall made statements about her having an extramarital affair to anyone. The Court finds that they did not make such statements to senior Navy officials.

On the record before the Court, Boone and Westfall did not make statements to senior Navy officials that Alessa was having an extramarital affair. Therefore, "Westfall Act certification is proper." *See Osborn*, 549 U.S. at 247.

**IV.    Conclusion**

Alessa has not met her burden to successfully challenge Westfall Act certification for her defamation claims. The United States remains the proper defendant for Counts VI and VII of Alessa's amended complaint. A separate order follows.

Date: ___April 3, 2025___                    _____

Deborah L. Boardman
United States District Judge